**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **No. 4:08-cr-00070** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **RITZ WILLIAMS,** | : | |
| **Defendant** | : | |

## MEMORANDUM

In this capital case, Defendant Ritz Williams moves the Court to strike the Government's amended notice of intent to seek the death penalty in its entirety (Doc. No. 705) or, in the alternative, to strike certain statutory and non-statutory aggravating factors alleged in the notice (Doc. Nos. 688, 690, 694, 696, 698, 700, 703). Defendant also moves the Court to issue an order directing the Government to comply with Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972). (Doc. No. 692.) In these motions, Defendant raises multiple challenges to the constitutionality of the Federal Death Penalty Act of 1994 ("FDPA"), 18 U.S.C. § 3591, et seq., on its face as well as to its constitutionality as applied in this case.

For the reasons stated more fully herein, the Court, declining to find the FDPA or the death penalty itself unconstitutional, will deny the motion to strike the notice in its entirety (Doc. No. 705) on those grounds. The Court will also deny Defendant's Brady/Giglio motion (Doc. No. 692), his three motions to strike the statutory aggravating factors (Doc. Nos. 690, 698, 703), and two of his motions to strike the non-statutory aggravating factor of future dangerousness (Doc. Nos. 688, 700). The Court will grant in part and deny in part Defendant's motion to strike the future dangerousness factor relating to evidence of disciplinary infractions (Doc. No. 694) and will grant in part and deny in part Defendant's motion to strike the non-statutory aggravating

factor of victim impact (Doc. No. 696). Specifically, the Court will order the Government to provide Defendant with additional information regarding the evidence it intends to offer in support of these factors. The Court, of course, retains the authority to exclude evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c).

## I. BACKGROUND

On July 29, 2009, a grand jury returned a superseding indictment charging Defendant with first-degree murder, in violation of 18 U.S.C. § 1111, and possession of a prohibited object, in violation of 18 U.S.C. § 1791. (Doc. No. 155.) These charges arise out of the killing of Alvin Allery at the Allenwood Federal Correctional Complex ("AFCC"), where both Defendant and Allery were inmates. (Id.) Video evidence reveals that, on September 28, 2005, as Defendant and Shawn Cooya,[1] a fellow inmate, walked with Allery along an internal corridor at the AFCC, Cooya grabbed Allery from behind and pinned his arms behind his back. (See Doc. No. 542 at 1-2.) Immediately after Cooya grabbed Allery, Defendant proceeded to stab Allery multiple times in the torso. (Id.) Following Allery's fall to the floor, Defendant and Cooya repeatedly kicked Allery in the head and torso until prison authorities arrived at the scene. (Id.)

18 U.S.C. § 1111(b) provides that a defendant who is found "guilty of murder in the first degree shall be punished by death or by imprisonment for life." Under the FDPA, if the Government intends to seek the death penalty against a defendant, it must, at "a reasonable time

---

[1] The superseding indictment also charges Defendant Shawn Cooya with first-degree murder in relation to the killing of Allery. (Doc. No. 155.) Defendant Cooya pleaded guilty to that charge on January 8, 2013 (Doc. No. 709), and the Court sentenced him to life imprisonment without the possibility of release on March 18, 2013 (Doc. No. 792).

before the trial," file a notice stating such intent as well as "setting forth the aggravating factor or factors that [it] . . . proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593(a). Proceedings under the FDPA are bifurcated into distinct trial and penalty phases, with a penalty phase only being required in that event that the jury returns a guilty verdict. During the penalty phase, both Defendant and the Government may present information "as to any matter relevant to the sentence." Id. § 3593(c). In particular, Defendant may present any information relevant to a mitigating factor, and the Government may present any information relevant to an aggravating factor set forth in its notice. Id. Information may be admitted during the penalty phase "regardless of its admissibility under the rules governing the admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." Id.

In order to impose a sentence of death, the jury must first determine that a defendant who is found guilty of a crime punishable by death acted with the requisite intent. Id. § 3591(a). Specifically, the jury must find beyond a reasonable doubt that the defendant:

> **(A)** intentionally killed the victim;
>
> **(B)** intentionally inflicted serious bodily injury that resulted in the death of the victim;
>
> **(C)** intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
>
> **(D)** intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

Id. § 3591(a)(2).

Second, the jury must consider information presented during the penalty phase in support of the aggravating factors alleged by the Government and the mitigating factors alleged by the defendant.  Aggravating factors, whether statutory or non-statutory, must be unanimously found beyond a reasonable doubt.  Id. § 3593(c)-(d).  If the jury does not find the existence of at least one statutory aggravating factor, a sentence of death may not be imposed.  Id. § 3593(d).  Conversely, mitigating factors may be "established by a preponderance of the information," and "[a] finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established . . . regardless of the number of jurors who concur that the factor has been established."  Id. § 3593(c)-(d).

If the jury finds the existence of at least one statutory aggravating factor, they must then "consider whether all the aggravating factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death."  Id. § 3593(e).  The jury then makes a unanimous sentencing recommendation based on the result of this weighing process.  Id.  The Court is bound by the recommendation, whether it be death or life imprisonment without the possibility of release.  Id. § 3594.

The Government filed its notice of intent to seek the death penalty against Defendant on July 30, 2009 (Doc. No. 162), and the Court granted the Government's motion to amend the notice on June 19, 2012 (Doc. No. 588).

## II.    CONSTITUTIONAL CHALLENGES TO THE FDPA

In his motion to strike the Government's amended notice of intent to seek the death penalty in its entirety, Defendant raises seven principal arguments: (1) the FDPA is imposed in an arbitrary, capricious, irrational, and discriminatory manner; (2) the United States Supreme Court's decision in <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), renders the FDPA unconstitutional; (3) the indictment violates the Fifth Amendment; (4) the FDPA does not permit jurors to make a reasoned choice between imposing a sentence of death or imposing a sentence of life in prison without the possibility of release; (5) the continued application of the FDPA unacceptably risks executing innocent persons; (6) the Government's inclusion of non-statutory aggravating factors in its notice is unlawful; and (7) evolving standards of decency prohibit capital punishment on constitutional grounds.  The Court will address each argument in turn.

### A.    Arbitrary, Capricious, Irrational, and Discriminatory Operation

Defendant advances three arguments in support of his claim that the FDPA is unconstitutional because it operates in an arbitrary, capricious, irrational, and discriminatory manner.  (Doc. No. 706 at 32-83.)  First, he argues that because the federal death penalty is rarely sought, and even more rarely imposed, its imposition is arbitrary and capricious and, therefore, unconstitutional.  His second argument is that the FDPA is unconstitutional because no principled basis exists to distinguish cases in which the federal penalty is imposed from those in which it is not.  Finally, Defendant contends that statistical evidence demonstrates discrepancies in the imposition of the federal death penalty based on race, gender, and geography.

### 1.    Infrequent Application and Imposition

Defendant's first contention is that the infrequency with which the federal death penalty is sought and imposed is indicative of arbitrariness and capriciousness, thereby rendering the FDPA unconstitutional. In advancing this argument, Defendant relies on Furman v. Georgia, 408 U.S. 238, 239 (1972), in which the Supreme Court held that Georgia's then-existing capital punishment statute was unconstitutional. In particular, Defendant centers his argument on a portion of Justice Stewart's concurring opinion, stating that the death sentences at issue were

> cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as [those committed by petitioners], the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed . . . . [T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and freakishly imposed.

Id. at 309-10 (Stewart, J., concurring) (footnotes omitted); see also id. at 293, 312-13 (Justices Brennan and White reaching similar conclusions). Defendant argues that this statement constitutes "the essence of" the per curiam Furman opinion and, citing statistical studies, avers that "the federal death penalty is [now] sought and imposed far more rarely than in the cases examined by Furman." (Doc. No. 706 at 33, 37.) He proffers evidence that, as of 2012, only seventy-two of the 3,138 death-eligible federal defendants have been sentenced to death. (Id. at 38.) Based on the infrequency with which the federal death penalty is sought and imposed, Defendant equates it with the statute invalidated in Furman. (Id. at 40-41.)

Defendant's argument lacks merit, chiefly because, as the Government points out, it fails to consider the Supreme Court's post-Furman precedent. (Doc. No. 756 at 5.) The Supreme Court has made clear that its opinion in Furman "was not based on the frequency with which the death penalty was sought or imposed. Rather, the primary emphasis of the Court's death penalty

6

jurisprudence has been the requirement that the discretion exercised by juries be guided so as to limit the potential for arbitrariness." United States v. Sampson, 486 F.3d 13, 23 (1st Cir. 2007); see also Kansas v. Marsh, 548 U.S. 163, 173-74 (2006); Gregg v. Georgia, 428 U.S. 153, 195 (1976). In Gregg, the Supreme Court, upholding Georgia's revised capital sentencing statute, described Furman as "mandat[ing] that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S. at 189. Further, the Court explicitly stated that

> the concerns expressed in Furman that the penalty of death not be imposed in an arbitrary and capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

Id. at 195. Together, Furman and Gregg require that a death penalty statute: (1) "rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." Marsh, 548 U.S. at 174.

The FDPA satisfies these requirements. First, it creates a bifurcated scheme that narrows the class of defendants eligible for the death penalty by requiring the jury to unanimously find that the defendant acted with the requisite intent and that the Government proved at least one statutory aggravating factor beyond a reasonable doubt. 18 U.S.C. §§ 3591(a)(2), 3593(c)-(d); see also Jones v. United States, 527 U.S. 373, 376-77 (1999) (summarizing the findings a jury must make under the FDPA before recommending the death sentence). Second, the FDPA

requires the jury to make an individualized determination as to whether the defendant should be sentenced to death. In making this decision, "the sentencing jury [must] consider all of the aggravating and mitigating factors and determine whether the former outweigh the latter (or, if there are no mitigating factors, whether the aggravating factors alone are sufficient to warrant a death sentence)." Jones, 527 U.S. at 377 (citing 18 U.S.C. §§ 3591(a), 3592, 3593(e)). Further,

> although a jury must unanimously agree that the Government established the existence of an aggravating factor beyond a reasonable doubt, § 3593(c), the jury may consider a mitigating factor in its weighing process so long as one juror finds that the defendant established its existence by a preponderance of the evidence, §§ 3593(c), (d).

Id. By performing the required narrowing function and ensuring that the jury's recommendation is based on an individualized assessment of the case, the FDPA "fully meets the requirements of guided discretion, suitably directing and limiting the leeway afforded to the decisionmakers." Sampson, 486 F.3d at 22-23.

Furthermore, the infrequency with which the federal death penalty is sought does not render the FDPA unconstitutional. Id. at 24. "To the extent that there may be an independent constitutional concern as to the decisional process by which the Government decides if it will seek the death penalty, that process contains numerous safeguards built into an articulated death penalty protocol." Id. (citing United States Attorneys' Manual § 9-10.000, http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/10mcrm.htm) (footnote omitted). Thus, the procedures employed by the FDPA are not arbitrary. Id. (citing Gregg, 428 U.S. at 195).

## 2.      Principled Basis for Distinguishing Cases

Defendant's second argument is that the absence of a principled basis for distinguishing

cases in which the federal death penalty is imposed from cases in which it is not imposed renders the federal death penalty unconstitutional. (Doc. No. 706 at 41-50.) In support of this argument, Defendant has provided the Court with case summaries "of the facts and circumstances of the present status or resolution of every completed authorized federal death penalty case since 1988." (Id. at 42; see also Doc. Nos. 707-1, 707-2.) Defendant asserts that this data reveals that "[t]here is no rhyme, reason, or predictability [as] to who is sentenced to death and who is not" and "provide[s] valuable insight into the hopelessly irremediable problem of arbitrariness and caprice that marks the administration of the federal death penalty system." (Doc. No. 706 at 42.) He argues that this Court should "declare that the FDPA must be interpreted so as to allow for proportionality and comparative review of the universe of federal death sentences to determine if they are imposed irrationally." (Id. at 50.) Such an interpretation, Defendant continues, "would lead to a conclusion that the FDPA cannot meet the requirements of Furman and would have to be invalidated until Congress could devise a mechanism for checking the arbitrary and irrational imposition of the ultimate punishment." (Id.)

Defendant's argument that a review of the provided case summaries must lead the Court to conclude that the federal death penalty is unconstitutionally arbitrary in its operation relies on Eddings v. Oklahoma, 455 U.S. 104, 112 (1982), in which the Supreme Court discussed the principle that "capital punishment be imposed fairly, and with reasonable consistency, or not at all." Other courts, however, have found that such reliance on Eddings is misplaced. See Sampson, 486 F.3d at 24; United States v. Barnes, 532 F. Supp. 2d 625, 634 (S.D.N.Y. 2008). Indeed, although the Eddings Court recognized the need for consistency in the imposition of the death penalty, the Court also went on to state that the jury's discretion to consider mitigating

9

evidence, such as the individual characteristics of the defendant and the circumstances of the offenses at issue, may not be limited. 455 U.S. at 112. Thus, the Supreme Court recognized "that a consistency produced by ignoring individual differences is a false consistency." Id. (citing Lockett v. Ohio, 438 U.S. 586 (1978)).

Moreover, the Supreme Court has stated that inconsistent outcomes in federal capital cases does not render the FDPA unconstitutional so long as jurors are able to exercise discretion in making individualized sentencing determinations based on the circumstances of each case. See McCleskey v. Kemp, 481 U.S. 279, 307 n.28 (1987) ("The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence . . . a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt."). In McCleskey, the Court elaborated:

> Individual jurors bring to their deliberations qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. The capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant. It is not surprising that such collective judgments often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation. On the contrary, it is the jury's function to make the difficult and uniquely human judgments that defy codification and that build discretion, equity, and flexibility into a legal system.

Id. at 311 (internal citations and quotations omitted).

In light of Eddings and McCleskey, the Court finds that Defendant has failed to show that there is no principled basis for distinguishing between cases in which the death penalty is imposed under the FDPA and those in which it is not. As other federal courts have concluded, the case summaries proffered by Defendant do not support a finding that the federal death

penalty has been imposed in an arbitrary and capricious manner. See Sampson, 486 F.3d at 25 ("The summaries on which [the defendant] relies to demonstrate inconsistency are devoid of details and fail to account for the objective circumstances of the underlying crimes."); United States v. Hammer, No. 96-cr-239, 2011 WL 6020577, at *5 (M.D. Pa. Dec. 1, 2011) (rejecting a similar argument based on case summaries and verdict sheets in other capital cases); Barnes, 532 F. Supp. 2d at 633-34.

### 3. Statistical Evidence

Defendant's final argument in support of finding the FDPA arbitrary, capricious, irrational, and discriminatory in its operation is that statistical evidence reveals discrepancies in the application of the death penalty based on race, geography, and gender. (Doc. No. 706 at 51-83.) This evidence – which includes congressional reports, law review articles, comments by past Attorneys General, and empirical studies – suggests that minority defendants, defendants from southern states, and defendants who are found guilty of killing white females, are disproportionately likely to receive death sentences. Defendant relies in part on the Department of Justice's ("DOJ") study of the administration of the federal death penalty from 1988 to 2000. (Id. at 54-60.) With respect to race, this study indicates that "more than 70% of the federal defendants targeted for the death penalty had been non-whites." (Doc. No. 706 at 56.) Additionally, Defendant proffers evidence indicating that, between 1988 and 2012, "74% of those selected for capital prosecutions are members of minority groups." (Id. at 61.) Regarding geography, the DOJ study reveals that, between 1995 and 2000, "of the 94 separate federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution." (Id. at 56.) Defendant also points to evidence indicating that "11 southern federal

jurisdictions account for . . . 65% . . . of the federal death verdicts returned by juries since the 1988 return of the federal death penalty." (Id. at 63.) Finally, with respect to "the white female victim effect," Defendant cites studies indicating that "those who are guilty of murdering white females are substantially more likely to face the death penalty and be sentenced to death than those who kill non-whites and males." (Id. at 75.) In particular, Defendant relies on a study submitted in United States v. Lecco, No. 05-cr-00107, 2010 WL 1233147 (S.D. W. Va. Mar. 22, 2010), indicating that "defendants in federal capital cases whose victims were white females were more than three times as likely to be sentenced to death than other federal capital defendants." (Id. at 80.)

Relying on this statistical evidence, Defendant raises due process and equal protection claims under the Fifth Amendment, contending that the federal death penalty "is equally as abhorrent and misguided" as the federal government's persecution, abuse, and slaughter of Native Americans in the southwest United States. (Id. at 54, 70.) Further, he contends that the federal death penalty "appears to operate so as to institutionalize racism" in violation of the Eighth Amendment. (Id. at 73-74.)

Federal courts have rejected similar arguments advanced by capital defendants. See, e.g., Sampson, 486 F.3d at 26; United States v. Jacques, No. 08-cr-117, 2011 WL 1675417, at *5 (D. Vt. May 4, 2011). In McCleskey, the Supreme Court rejected claims brought under the Eighth Amendment and the Equal Protection Clause based on statistical evidence of racial disparities in capital sentencing. 481 U.S. at 292. The Court held that "to prevail under the Equal Protection Clause, [the defendant] must prove that the decisionmakers in his case acted with discriminatory purpose." Id. (emphasis in original). Furthermore, the Court held that statistical evidence alone

does not establish an Eighth Amendment violation, observing:

> Apparent disparities in sentencing are an inevitable part of our criminal justice system . . . . [O]ur consistent rule has been that constitutional guarantees are met when "the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible." Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious.

Id. at 312-13 (citation omitted) (quoting Singer v. United States, 380 U.S. 24, 35 (1965)). Here, because Defendant has failed to present specific evidence of purposeful discrimination against himself and because the proffered evidence "provides no basis for attributing the statistical discrepancies with respect to geography and race [and gender] in FDPA prosecutions to discrimination rather than to other factors, such as differences in the nature of the crimes involved," his Eighth Amendment claim must fail. Sampson, 486 F.3d at 26-27.

The Supreme Court did not explicitly hold in McCleskey that statistical evidence is insufficient to sustain a claim brought under the Due Process Clause of the Fifth Amendment. But Defendant's Fifth Amendment claim is practically identical to his Eighth Amendment claim. Both claims, relying solely on statistical evidence, assert that Defendant has the right to not be subjected to an arbitrary and capricious system of capital punishment directly impacted by race, geography, and gender. Accordingly, the Supreme Court's rejection of an Eighth Amendment claim based only on statistical evidence of discrimination bars Defendant from succeeding on a Fifth Amendment claim that is nearly identical to his Eighth Amendment claim. See Sampson, 486 F.3d at 26 ("Bare statistical discrepancies are insufficient to prove a Fifth Amendment violation with respect to the implementation of a statute."); Jacques, 2011 WL 1675417, at *5 (rejecting the defendant's Fifth and Eighth Amendment claims based solely upon statistical

evidence of racial, geographic, and gender-based disparities).  Because the law is well settled on these issues, the Court will not hold an evidentiary hearing on them.

Finally, Defendant contends that the Supreme Court's pronouncement in Gregg that a sentencing body's discretion "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action" is "inherently incompatible" with the Supreme Court's holdings in Lockett and Eddings that a jury's discretion to impose a life sentence must not be limited.  (Doc. No. 706 at 81-83.)  Based on this purported inconsistency, Defendant contends that the Court should declare the FDPA unconstitutional.  As discussed, in Gregg, the Supreme Court, in upholding Georgia's revised capital sentencing statute and reviewing Furman, stated that the discretion afforded to a sentencing body in determining whether to impose the death sentence "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  428 U.S. at 189.  The Court went on to state that, generally, "these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information."  Id. at 195.  In Eddings, decided six years later, the Supreme Court reaffirmed the rule pronounced in Lockett that the jury's discretion to consider mitigating evidence may not be limited.  455 U.S. at 112.

The Court is not convinced that Eddings and Lockett are inconsistent with Gregg.  In McCleskey, the Supreme Court recognized that "[t]he existence of . . . discretionary stages [in capital cases] is not determinative of" whether a system of capital punishment operates in an arbitrary or capricious manner.  481 U.S. at 307.  The Court continued:

> At each of [the] stages [in a capital proceeding] an actor in the
> criminal justice system makes a decision which may remove a

> defendant from consideration as a candidate for the death penalty. <u>Furman</u>, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates our Constitution. <u>Furman</u> held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on particularized circumstances of the crime and the defendant.

<u>Id.</u> (quoting <u>Gregg</u>, 428 U.S. at 199) (footnote omitted). In light of <u>McCleskey</u>, the Court concludes that a federal jury's discretion to decline imposing the death sentence, after evaluating the defendant's character and the individual circumstances of his offenses, neither offends the Constitution nor provides a basis for rendering the FDPA unconstitutional. <u>See id.</u>; <u>Eddings</u>, 455 U.S. at 110; <u>Lockett</u>, 438 U.S. at 604; <u>United States v. Johnson</u>, No. 05-cr-80337, 2009 WL 1856240, at *5 (E.D. Mich. June 29, 2009).

**B.     <u>Ring</u>-Related Arguments**

Defendant's second main argument in support of striking the amended notice of intent to seek the death penalty in its entirety is that the Supreme Court's decision in <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), renders the FDPA unconstitutional. (Doc. No. 706 at 84-127.) Defendant's principal line of argument is that the FDPA is unconstitutional because <u>Ring</u> requires that the aggravating factors necessary for a sentence of death be presented to a grand jury and charged in an indictment whereas the FDPA vests the prosecutor with the authority to identify the applicable aggravating factors. (<u>Id.</u> at 84-88.) Although the FDPA is silent with respect to the grand jury's role in a capital case, Defendant contends that the FDPA "explicitly reserves the selection and notice of aggravating factors to the exclusive discretion of the prosecutor." (<u>Id.</u> at 88.) In a more cursory fashion, Defendant also advances the following contentions: (1) the

Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), demonstrates that reading the requirement into the FDPA that aggravating factors be presented to the grand jury conflicts with congressional intent; (2) post-<u>Ring</u>, Congress delegated legislative power to the executive branch in violation of the nondelegation doctrine; and (3) the Federal Rules of Criminal Procedure do not permit grand juries to return "special findings" in an indictment. (<u>Id.</u> at 108-27.) The Court will address each argument in turn.

### 1. Perceived Conflict Between <u>**Ring**</u> and the FDPA

As discussed, the FDPA outlines the circumstances under which a defendant who is found guilty of an offense such as first-degree murder may be eligible for the federal death penalty. First, the Government must file a notice of intent to seek the death penalty against the defendant, containing the aggravating factors it intends to prove as justifying a death sentence. 18 U.S.C. § 3593(a). If the defendant is found guilty of the offense at trial, the Court conducts a penalty phase during which the parties present evidence in support of aggravating and mitigating factors relevant to the imposition of the death penalty. <u>Id.</u> § 3593(c). The jury may only return a unanimous recommendation that a death sentence be imposed if they determine first that the defendant acted with the requisite intent, then that the Government proved at least one statutory aggravating factor beyond a reasonable doubt, and, finally, that the aggravating factor or factors sufficiently outweigh the mitigating factors to justify a death sentence. <u>Id.</u> § 3593(c)-(e).

No provision of the FDPA, however, references the role of the grand jury. As observed by the United States Court of Appeals for the First Circuit:

> This omission is understandable. Congress enacted the FDPA in 1994 against the backdrop of <u>Walton v. Arizona</u>, 497 U.S. 639 (1990), in which the Supreme Court held that "the Sixth Amendment does not require that the specific findings authorizing the imposition

of the sentence of death be made by the jury." Id. at 648 (quoting Hildwin v. Florida, 490 U.S. 638, 640-41 (1989) (per curiam)) (internal quotation marks omitted). Essentially, the Walton Court held that the facts necessary to render a defendant eligible for the death penalty were not elements of the offense itself, making inapplicable the Fifth Amendment requirement that the elements of an offense be charged by a grand jury in an indictment. See id. at 649.

The Supreme Court first cast doubt on Walton in Jones v. United States, 526 U.S. 227 (1999). There, the Court . . . held that the fact that a defendant caused serious bodily injury to another during the commission of a crime was an element of a greater offense that had to be both charged in an indictment and found by a jury at trial beyond a reasonable doubt. See id. at 232-39. In reaching these conclusions, the Jones Court distinguished the sentencing factors upheld in Walton. See id. at 251.

The next Term, the Court held that any fact that increases the maximum authorized statutory sentence "is the functional equivalent of an element of a greater offense," which must be charged in an indictment and proved beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 490, 494 n.19 (2000).

Finally, in 2002, the Court explicitly overruled Walton. See Ring, 536 U.S. at 609.

Sampson, 486 F.3d at 20-21. In overruling Walton, the Ring Court held that, under the Sixth Amendment, aggravating circumstances necessary for the imposition of the death penalty must be found by a jury beyond a reasonable doubt. 536 U.S. at 602, 609. Post-Ring decisions by appellate courts "firmly establish[] that the mental culpability and aggravating factors required by the FDPA must – in addition to being included in the government's notice to seek the death penalty – be presented to a grand jury, charged in the indictment, and proved beyond a reasonable doubt." Sampson, 486 F.3d at 21; see also United States v. Fell, 531 F.3d 197, 237 (2d Cir. 2008); United States v. Brown, 441 F.3d 1330, 1367 (11th Cir. 2006), cert. denied, 549 U.S. 1182 (2007); United States v. Higgs, 353 F.3d 281, 298 (4th Cir. 2003).

17

Defendant first contends that the FDPA is in conflict with <u>Ring</u> and that the conflict may only be resolved by Congress' amendment of the FDPA. The alleged conflict is that the "FDPA neither contemplates affording, nor permits, the grand jury any role in determining which aggravating factors are to be alleged in a federal capital prosecution" but, rather, vests the prosecutor with the exclusive authority to identify the aggravating factors. (Doc. No. 706 at 86-98.) <u>Ring</u>, Defendant avers, has "rendered the exclusive statutorily prescribed mechanism selected by Congress invalid." (<u>Id.</u> at 100.) Defendant, however, also recognizes that "various Courts of Appeals have considered the issue herein and concluded that there is no constitutional or statutory impediment to presenting the FDPA's aggravating factors to a grand jury in order to avoid unconstitutionality under [<u>Ring</u>]." (<u>Id.</u> at 115.) Indeed, federal courts have uniformly rejected Defendant's argument. <u>See, e.g.</u>, <u>Sampson</u>, 486 F.3d at 21; <u>Brown</u>, 441 F.3d 1330, 1367; <u>United States v. Allen</u>, 406 F.3d 940, 949 (8th Cir. 2005), <u>cert. denied</u>, 549 U.S. 1095 (2006); <u>United States v. Barnette</u>, 390 F.3d 775, 788-90 (4th Cir. 2004), <u>vacated on other grounds</u>, 546 U.S. 803 (2005); <u>United States v. Robinson</u>, 367 F.3d 278, 290 (5th Cir. 2004); <u>Jacques</u>, 2011 WL 1675417, at *6; <u>Barnes</u>, 532 F. Supp. 2d at 632-34.

Although the court decisions addressing the interplay between <u>Ring</u> and the FDPA conclusively demonstrate the misguided nature of Defendant's argument, Defendant contends that all of these decisions were wrongfully decided because: (1) they fail to address, or adequately consider, <u>United States v. Jackson</u>, 390 U.S. 570 (1968); and (2) they "ignore the plain language of the FDPA with respect to whether the grand jury is authorized to allege aggravating factors." (Doc. No. 706 at 116.) Defendant bases his argument on the premise that the doctrine of separation of powers and <u>Jackson</u> make clear that only the legislature is vested

with the authority to define or modify federal criminal offenses and punishments. (Id. at 100-01.) He then requests that the Court interpret federal prosecutors' charging of aggravating factors in an indictment as being the functional equivalent of redefining criminal offenses and the contours of the FDPA. The consequence of such an interpretation, he contends, is that grand juries will have the ultimate duty to identify aggravating factors in a federal capital prosecution despite the fact that Congress deliberately placed this duty in the hands of federal prosecutors. (Id. at 110.)

First, the Court agrees with the other federal courts that have concluded that the FDPA does not exclusively vest the authority to identify aggravating factors with the prosecutor. See, e.g., Sampson, 486 F.3d at 21 ("The FDPA does not, as [Defendant suggests], grant to prosecutors exclusive authority for determining the likely existence of aggravating factors."). As the United States Court of Appeals for the Eleventh Circuit has recognized, the FDPA contains no language regarding grand juries and, thus, no language prohibiting the submission of aggravating factors to a grand jury:

> [N]othing in the [FDPA] forbids, or is inconsistent with, prosecutors' taking of the additional step of including the statutory aggravating factors in the indictment and submitting [them] to the grand jury. Indeed, a statute will seldom expressly provide for submitting elements of an offense to the grand jury. It is simply well-established law – the background against which statutes are enacted – which indicates that elements of a crime should be submitted to the grand jury.

United States v. LeCroy, 441 F.3d 914, 921 (11th Cir. 2006); see also Barnes, 532 F. Supp. 2d at 639 ("[N]o language in the FDPA . . . mentions grand jury findings, let alone prohibits them with respect to facts constituting aggravating circumstances . . . . [W]e would expect a clear statement in the statute expressing an intent to abrogate that authority if Congress truly intended

to do so.") (quoting <u>United States v. Williams</u>, No. 00-cr-1008, 2004 WL 2980027, at *11 (S.D.N.Y. Dec. 22, 2004)).  Thus, the Court rejects Defendant's contention that the FDPA explicitly and exclusively delegates the authority to identify aggravating factors to the prosecutor.

Second, the Court is not persuaded by Defendant's reliance on <u>Jackson</u>.  In <u>Jackson</u>, the death-penalty provision of the Federal Kidnaping Act was challenged on the basis that it encouraged defendants to waive their right to a jury trial because it provided that only a jury could impose a death sentence.  390 U.S. at 572-73.  In defending the Act's constitutionality, the Government encouraged the Supreme Court to interpret the statue as allowing the trial judge – in the event that a defendant pleaded guilty or waived his right to a jury trial – to convene a "special jury" to determine whether the death penalty was warranted.  <u>Id.</u>  The Supreme Court refused to accept the Government's proposed interpretation and struck down the death-penalty provision, explaining that it could not "create from whole cloth a complex and completely novel procedure and . . . thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality."  <u>Id.</u> at 580.  But the Court also recognized that if the Government's proposed procedure "had been recognized elsewhere in the federal system when Congress enacted the . . . Act, perhaps Congress' total silence on the subject could be viewed as a tacit incorporation of this sentencing practice into the new law."  390 U.S. at 578.

The First Circuit thoroughly examined <u>Jackson</u> in the context of the FDPA in <u>United States v. Sampson</u>.  The court held that allowing federal prosecutors to plead aggravating factors in indictments in FDPA cases does not require courts to "create from whole cloth a complex and completely novel procedure" because "the role of the grand jury in charging the elements of an

offense has long been established."  486 F.3d at 22.  Rather, the court found that prosecutors merely "honor[] that role . . . by simply present[ing] the grand jury with evidence of possible aggravating factors."  Id.

The Court agrees with the First Circuit's conclusion that the novelty of the procedure the Government proposed in <u>Jackson</u> with respect to the Federal Kidnaping Act is distinguishable from the procedure at issue in this case.  Although the Government's proposal in <u>Jackson</u> "would have required the Court to perform a complete statutory rewrite, which is a legislative and not a judicial function[,] . . . allowing a grand jury to consider and charge aggravating factors under the FDPA does not have any effect either on the substantive aspects of the statute or on the discrete roles that the statute assigns to the judge, the prosecutor, and the jury, respectively."  <u>Id.</u> at 23; <u>see also</u> <u>United States v. Rodriguez</u>, No. 04-cr-55, 2007 WL 466752, at *7 (D.N.D. Feb. 12, 2007) ("Permitting a grand jury now to consider the statutory aggravating factors does nothing more than augment the FDPA as it is currently written by providing one more level of procedural protection for the defendant.").  The Court agrees with the Government that "the grand jury's role in the criminal justice system to find and charge the elements of a criminal offense" is "far from novel," as it "is enshrined in the Fifth Amendment . . . and well-recognized in the common law and statutory law."  (Doc. No. 756 at 19.)  Thus, the Court rejects Defendant's argument that <u>Jackson</u> renders the procedures here unconstitutional.


2.     **Inapplicability of <u>United States v. Booker</u>**

Defendant further contends that the Supreme Court, in <u>United States v. Booker</u>, rejected "[t]he very same type of judicial and prosecutorial restructuring of a statute to conform with

21

constitutional imperatives" allegedly at issue in this case.  (Doc. No. 706 at 108.)  Defendant

argues that, under Booker, the reading into the FDPA of the requirement that aggravating factors

be presented to the grand jury and contained in the indictment is contrary to congressional intent.

(Id. at 108-10.)  In response, the Government avers that "grand jury presentment and indictment

does not transform the FDPA's scheme or contravene Congress's intentions in enacting the

statute."  (Doc. No. 756 at 20.)

In Booker, the Supreme Court determined that the mandatory portions of the Federal

Sentencing Guidelines violated the Sixth Amendment because they permitted the sentencing

judge to find sentence-enhancing factors by a preponderance of the evidence.  543 U.S. at 232.

The Court then severed the provision making the sentencing guidelines mandatory as well as a

separate section concerning appellate review of a sentence that depended on the mandatory

nature of the guidelines.  Id. at 258-61.  According to Justice Breyer's opinion, "were the [Sixth

Amendment right to a jury trial] added onto the Sentencing Act as currently written, the

requirement would so transform the scheme that Congress created that Congress likely would not

have intended the Act as so modified to stand."  Id. at 249.

Unlike the Sentencing Act, the FDPA provides a scheme that remains consistent with

congressional intent even in light of determinations made by the Supreme Court since its

enactment.  As discussed, the FDPA authorizes the Government to seek the death penalty in

cases involving an offense described in 18 U.S.C. § 3591 by providing the defendant with notice

of its intent to seek the death penalty and of "the aggravating factor or factors that the

government, if the defendant is convicted, proposes to prove as justifying a sentence of death."

18 U.S.C. § 3593(a).  Further, the FDPA provides that a defendant is eligible for the death

penalty only if a jury finds beyond a reasonable doubt that the defendant acted with the statutorily required intent and that at least one statutory aggravating factor exists. Id. §§ 3591-93. Finally, after making these findings, the jury must consider both mitigating and aggravating factors before determining whether to impose the death penalty. Id. § 3593(c)-(e). As discussed, the Court finds that permitting a grand jury to assess and charge aggravating factors in an action under the FDPA does not affect the substantive aspects of the statute or the roles assigned to the judge, the prosecutor, and the jury. Thus, the FDPA need not be amended to permit a grand jury to consider factors that may potentially increase Defendant's sentence.

### 3.  Nondelegation Doctrine

Next, as a "corollary to the Separation of Problems [argument]," Defendant contends that the nondelegation doctrine precludes executive or judiciary action, "whether separately or in tandem, substituting either's judgment for that of Congress in relation to prescribing the elements and the procedures for application of the federal death penalty." (Doc. No. 706 at 111-12.) "The nondelegation doctrine is rooted in the principle of separation of powers . . . . [and] mandate[s] that Congress generally cannot delegate its legislative power to another Branch." Mistretta v. United States, 488 U.S. 361, 371-72 (1989) (citing Field v. Clark, 143 U.S. 649, 692 (1892)). The Supreme Court, however, has recognized "that the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." Id. at 372. In J.W. Hampton, Jr., & Company v. United States, 276 U.S. 394, 406, 409 (1928), Chief Justice Taft explained the Court's approach to cooperative ventures:

> In determining what [Congress] may do in seeking assistance from
> another branch, the extent and character of that assistance must be

fixed according to common sense and the inherent necessities of the government co-ordination.

. . . .

[So long as Congress] shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.

In response to Ring, the executive branch – without prompting from Congress – chose to provide for the presentment of aggravating factors to a grand jury in FDPA cases. Because no act of Congress delegating its legislative power to the executive power has occurred, Defendant's argument necessarily fails. Nevertheless, Defendant contends that "[s]ince Congress could not delegate to the Executive Branch the power to rewrite the FDPA to its post-Ring liking, a fortiori the Executive Branch cannot simply assume that power by attempting to substitute new procedures and elements for those originally provided by Congress, but rendered constitutionally infirm by the Ring, Jones, Apprendi trilogy." (Doc. No. 706 at 114.) But Defendant does not support this argument with legal authority. Simply put, the Court may not find a violation of the nondelegation doctrine where Congress has made no delegation of its legislative authority. See, e.g., Higgs, 353 F.3d at 321 (stating that the FDPA does not delegate legislative power to the prosecutor and finding that, to the extent that the prosecutor's discretion "to argue that additional nonstatutory aggravators combine with the statutory aggravators to outweigh any mitigating factors that have been submitted for consideration, . . . could be viewed as a delegation of legislative power, such delegation is constitutionally permissible.") (citing United States v. Tipton, 90 F.3d 861, 895 (4th Cir. 1996)).

### 4.    Special Findings and Other Ring-Related Claims

Finally, Defendant argues that neither Rule 7 of the Federal Rules of Criminal Procedure nor the Indictment Clause of the Fifth Amendment permit grand juries to return "special findings" in an indictment. (Doc. No. 706 at 114.) The Court disagrees, as "nothing in the Federal Rules of Criminal Procedure [or the Fifth Amendment] that prohibits the grand jury from alleging all the elements of an offense that it proposes to charge." Sampson, 486 F.3d at 23 n.2; see also Jacques, 2011 WL 1675417, at *9. In his brief, Defendant also preemptively refutes anticipated arguments by the Government based on post-Apprendi drug cases, severability analysis, and the doctrine of constitutional avoidance. (Doc. No. 708 at 119-27.) The Government, however, does not advance any of these arguments in its brief in opposition. Thus, the Court need not address them.

### C.    Fifth Amendment Challenges

Defendant's third principal argument in support of striking the amended notice in its entirety is that the indictment violates the Fifth Amendment because: (1) it does not state that the special findings should subject Defendant to the death penalty or otherwise indicate that the grand jury intended to return an indictment charging a capital offense; (2) it does not allege that the aggravating factors present in this case sufficiently outweigh the mitigating factors to justify the imposition of a death sentence; and (3) the non-statutory aggravating factors are not supported by the indictment. (Doc. No. 706 at 128-46.)

### 1.    Special Findings

Defendant first contends that the grand jury's special findings must be stricken from the indictment because the grand jury was not aware of the consequences of those findings. (Id. at 129-36.) According to Defendant, the framers of the Constitution intended the grand jury to

"retain the power to choose which defendants would receive a sentence of death upon conviction," and the Government violated the Fifth Amendment by failing to inform the grand jury that Defendant "would be held to answer to an offense punishable by death" as a result of their special findings.  (Id. at 130-31.)  In support, Defendant cites the model grand jury charge of the Administrative Office of the United States Courts, which provides that grand juries should not be concerned about punishment in the event of conviction.  (Id. at 132.)  Grand juries who are not informed of the consequences of their special findings in a capital case, Defendant continues, "cannot express the conscience of the community or perform [their] constitutionally assigned role as a 'barrier . . . between the liberties of the people and the prerogative of the [government]."  (Id. at 133 (quoting Harris v. United States, 536 U.S. 545, 564 (2003)).)  Finally, he contends that the petit jury in a capital case does not sufficiently act as such a barrier because, having been "death qualified,"[2] the petit jury "believe that the death penalty is an appropriate punishment and . . . express[] a willingness to impose it,"  "are more conviction prone," and are less likely to include African Americans and women.  (Id. at 134-35.)

Defendant cites no legal authority in support of his assertion that the grand jury must be informed that its special findings might make the defendant eligible for the death penalty.  Moreover, the role of the grand jury is not to

> make findings or recommendations concerning punishment or sentencing and such considerations should not influence their decision.  It is for the petit jury to make that determination.  The role of the grand jury simply is to investigate possible crimes against the

---

[2] "'Death qualification' refers to the process of removing from the jury pool potential jurors who are categorically opposed to the death penalty.  The Supreme Court has held that 'the Constitution does not prohibit the States from 'death qualifying juries in capital cases.'"  Jacques, 2011 WL 1675417, at *9 n.7 (quoting Lockhart v. McCree, 476 U.S. 162, 173 (1986)).

> sovereign so that it can make a judgment whether a trial on specific charges is necessary.

United States v. Matthews, 246 F. Supp. 2d 137, 146-47 (N.D.N.Y. 2002) (quoting United States v. Suleiman, 208 F.3d 32, 39 (2d Cir. 2000)) (internal quotation marks omitted); see also United States v. Haynes, 269 F. Supp. 2d 970, 981 (W.D. Tenn. 2003) ("The grand jury's role is not to decide whether probable cause supports the imposition of a particular sentence against a charged individual; rather, the grand jury check on prosecutorial power stems from its independent factual determination of the existence of probable cause for the essential elements of the charged offense.").  Thus, the Court agrees with the Government that the grand jury "was able to fulfill its constitutional role in determining whether there was probable cause to charge [Defendant with] the crimes in the indictment without considering potential sentences."  (Doc. No. 756 at 24.)

### 2. Elements of a Capital Crime

Defendant next argues that the Government's amended notice of intent to seek the death penalty must be stricken because the Government "did not present further elements necessary for the grand jury to make the decision as to whether [Defendant] should be subject to the death penalty, i.e., whether (1) the aggravating factors outweigh the mitigating factors and (2), whether they outweighed the mitigating factors sufficiently to justify a sentence of death."  (Doc. No. 706 at 136.)  Without these findings of fact, Defendant avers, "the maximum punishment faced by a capital defendant is lifetime incarceration" because all elements of a crime must be submitted to the grand jury for consideration.  (Id. at 137.)

The Court rejects this argument.  The United States Court of Appeals for the Eighth Circuit has explained that although an indictment must charge at least one statutory aggravating

factor, it need not allege "all of the factors that might be weighed by the jury deciding whether to impose a death sentence." United States v. Purkey, 428 F.3d 738, 749 (8th Cir. 2005) (citing Higgs, 353 F.3d at 299), cert. denied, 543 U.S. 1004 (2004) (emphasis in original). The Eighth Circuit further noted that, for an indictment:

> [I]t makes no sense to speak of the weighing process mandated by 18 U.S.C. § 3593(e) – that is, the lens through which the jury must focus the facts that it has found to produce an individualized determination regarding "whether the defendant should be sentenced to death, to life imprisonment, without possibility of release or some other lesser sentence."

Id. at 750 (quoting 18 U.S.C. §3593(e)); see also United States v. Mitchell, 502 F.3d 931, 994 (9th Cir. 2007) (noting that the grand jury need not weigh aggravating and mitigating factors because they have "no way of knowing what mitigating factors the defendant will urge"). The Court, adopting this reasoning, finds that the Government fulfilled its obligation to include statutory aggravating factors in the indictment and was not required to present evidence of mitigating factors or require the grand jury to engage in the weighing process mandated by 18 U.S.C. § 3593(e).

### 3. Non-Statutory Aggravating Factors

Next, Defendant argues that the non-statutory aggravating factors alleged in the Government's notice must be stricken because the factors are not alleged in the indictment and the Indictment Clause of the Fifth Amendment requires that the grand jury screen the factors. (Doc. No. 706 at 145-46.) In advancing this argument, Defendant requests that the Court adopt the reasoning of United States v. Green, 372 F. Supp. 2d 168 (D. Mass. 2005), to hold that non-statutory aggravating factors not charged in the indictment must be dismissed from the notice of intent to seek the death penalty. (Id.) No appellate court, however, has held that non-statutory

28

aggravating factors must be set forth in the indictment.  See, e.g., Fell, 531 F.3d at 238; Mitchell, 502 F.3d at 979; LeCroy, 441 F.3d at 922; Purkey, 428 F.3d at 749-50; United States v. Bourgeois, 423 F.3d 501, 507-08 (5th Cir. 2005); Higgs, 353 F.3d 281, 298 (4th Cir. 2003).  For example, the United States Court of Appeals for the Fifth Circuit has explained that non-statutory aggravating factors need not be alleged in the indictment because they "do not render a criminal defendant eligible for the death penalty" but, rather, are considered "only after the defendant is determined to be death-eligible."  Bourgeois, 423 F.3d at 507 (emphasis in original); see also Higgs, 353 F.3d at 299 ("Because nonstatutory aggravating factors do not increase the available punishment to which a defendant might be subjected, they are not required to be alleged in the indictment.").  The Court, adopting the reasoning of the Fifth Circuit and the other appellate courts reaching similar conclusions, will reject Defendant's argument.

    **D.**    **Reasoned Choice Between Sentences**

    Defendant's fourth chief argument in support of striking the amended notice and declaring the FDPA unconstitutional is that the FDPA fails to provide a reasonable standard for jurors to employ in balancing aggravating and mitigating factors.  (Doc. No. 706 at 146-55.)  Specifically, Defendant contends that the jury, during the penalty phase,

> will be expected . . . to apply [the burden of beyond a reasonable doubt] to aggravating factors and another burden, preponderance of the evidence, to mitigating factors.  Jurors will be expected to segregate the mental state threshold factors from aggravating and mitigating factors, and from the weighing process, by not considering them, in determining the appropriateness of a death sentence.  In the final analysis, jurors are asked, under the FDPA, to determine at what point aggravating factors outweigh mitigating factors 'sufficiently' to justify a sentence of death.  It is unreasonable to expect even the most conscientious and reasonably intelligent jurors to parse this melange of concepts and come out with an understanding of the process or a principled verdict.  This very real possibility of

confusion causes the FDPA to be unconstitutional.

(Id. at 146-47.)  Defendant argues that the risk of juror confusion makes the FDPA unconstitutional under the Eighth and Fourteenth Amendments, which require that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  (Id. at 147 (quoting Gregg, 428 U.S. at 189).)

As evidence of this risk of juror confusion, Defendant relies on several studies that present evidence that jurors in capital cases misunderstand "what they are supposed to do during the penalty phase of a death penalty trial."  (Id. at 148.)  These studies, according to Defendant, find, inter alia: (1) eighty percent of the juries returning a death verdict "did so believing that life imprisonment without the possibility of parole did not really mean life without parole;" (2) more than two thirds of jurors lacked "a workable understanding of what constituted mitigation evidence;" (3) sixty percent of jurors "rejected mitigation evidence because it did not completely account for the defendant's actions;" and (4) many jurors automatically vote to impose the death penalty if the defendant is found guilty of murder."[3]  (Id. at 148-53.)

_____

[3] Defendant cites the following studies and journal articles: Ursula Bentele & William J. Bowers, How Jurors Decide On Death: Guilt Is Overwhelming; Aggravation Requires Death; and Mitigation Is No Excuse, 66 BROOK. L. REV. 1011 (2001); William J. Bowers, The Capital Jury Project: Rationale, Design, and Preview of Early Findings, 70 IND. L.J. 1043 (1995); William J. Bowers & Wanda D. Foglia, Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing, 39 CRIM. L. BULL. 51 (2003); William J. Bowers, et al., Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt-Trial Experience, and Premature Decision Making, 83 CORNELL L. REV. 1476 (1998); Mark Costanzo & Sally Costanzo, Jury Decision Making in the Capital Penalty Phase: Legal Assumptions, Empirical Findings, and a Research Agenda, 16 LAW & HUM. BEHAV. 185 (1992); Theodore Eisenberg & Martin T. Wells, Deadly Confusion: Juror Instruction in Capital Cases, 79 CORNELL L. REV. 1

The flaw in Defendant's argument, the Government avers, is that the argument ignores the "'crucial assumption' underlying the system of trial by jury . . . that juries will follow the instructions given them by the trial judge."  (Doc. No. 756 at 29 (quoting <u>Marshall v. Lonberger</u>, 459 U.S. 422, 438 n.6 (1983)).)  Indeed, this assumption is "rooted . . . in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process."  <u>Adamson v. Cathel</u>, 633 F.3d 248, 258 (3d Cir. 2011) (quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987)).  Moreover, the Government, relying on <u>United States v. Llera Plaza</u>, 179 F. Supp. 2d 444, 450 (E.D. Pa. 2001), points out that counsel for Defendant "will have the opportunity to participate fully in the process of formulating the instructions which will frame the jury's deliberations.  There is no reason to believe that the jury will find the collaborative handiwork of court and counsel to be incomprehensible."  (Doc. No. 756 at 30.)  The Government also points out that many of the studies relied on by Defendant reveal that out of fifty-seven defendants who faced the death penalty, only seventeen of them were sentenced to death by a death-qualified jury, with some juries splitting their verdict by sentencing one defendant to death and another to life imprisonment.  (<u>Id.</u>)

The Court, adopting the reasoning of district courts that have concluded that challenges

---

(1993); Theodore Eisenberg, <u>et al.</u>, <u>Jury Responsibility in Capital Sentencing: An Empirical Study</u>, 44 Buff. L. Rev. 339 (1996); Stephen P. Garvey, <u>Aggravation and Mitigation in Capital Cases: What Do Jurors Think?</u>, 98 COLUM. L. REV. 1538 (1998); William S. Geimer & Jonathan Amsterdam, <u>Why Jurors Vote Life Or Death: Operative Factors in Ten Florida Death Penalty Cases</u>, 15 AM. J. CRIM. L. 1 (1987); Craig Haney, <u>et al.</u>, <u>Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death</u>, 50 J. SOC. ISSUES 149 (1994); Craig Haney & Mona Lynch, <u>Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions</u>, 18 LAW & HUM. BEHAV. 411 (1994); James Luginbuhl, <u>Comprehension of Judges' Instructions in the Penalty Phase of a Capital Trial: Focus on Mitigating Circumstances</u>, 16 LAW & HUM. BEHAV. 203 (1992); Peter Meijes Tiersma, <u>Dictionaries and Death: Do Capital Jurors Understand Mitigation?</u>, UTAH L. REV. 1 (1995)

to the FDPA based on the incomprehensibility of jury instructions cannot be adequately addressed at the pretrial stage, finds that Defendant's challenges are premature.  <u>See, e.g.</u>, <u>United States v. Runyon</u>, No. 08-cr-16, 2009 WL 87506, at *2 (E.D. Va. Jan. 9, 2009); <u>Llera Plaza</u>, 179 F. Supp. 2d at 450.  Because Defendant will have the opportunity to participate in the formation of the jury instructions – as well as the opportunity to challenge any proposed instructions – the Court must reject the argument that the jury instructions are likely to cause severe confusion. Further, the Court will deny Defendant's request for an evidentiary hearing to permit the presentation of expert testimony and empirical evidence in support of this argument as premature.

### E.  Risk of Executing Innocent Persons

Defendant's fifth main argument challenging the FDPA's constitutionality is that "in light of overwhelming evidence that continued enforcement of the federal death penalty will lead to the execution of a meaningful number of innocent people, the federal death penalty should be declared unconstitutional."  (Doc. No. 706 at 156.)  Defendant recognizes that this argument was rejected by the United States Court of Appeals for the Second Circuit in <u>United States v. Quinones</u>, 313 F.3d 49 (2d Cir. 2002), but requests that this Court consider the argument in light of the fact that "in the ten years that have passed since that decision, a steadily increasing number of innocent prisoners have been released from this nation's death rows."  (Doc. No. 706 at 156 n.58.)  Defendant, however, does not claim to be one of those innocent persons who may be wrongly executed.

In opposition, the Government emphasizes that the Due Process Clause of the Fifth Amendment "contemplates the death penalty as the ultimate punishment in the federal criminal

justice system." (Doc. No. 756 at 32.)  Opponents of the death penalty, the Government

continues, "have raised the specter of executing an innocent person for as long as the death

penalty debate has raged and those arguments have been rejected." (Id. at 33.)  For example, in

Quinones, the Second Circuit, reversing the district court's decision, held that the FDPA was

constitutional, observing:

> [T]he argument that innocent people may be executed – in small or
> large numbers – is not new; it has been central to the centuries-old
> debate over both the wisdom and constitutionality of capital
> punishment, and binding precedents of the Supreme Court prevent us
> from finding capital punishment unconstitutional based solely on a
> statistical or theoretical possibility that a defendant might be
> innocent.

313 F.3d at 63.  The court went on to hold that,

> to the extent the defendants' arguments rely upon the Eighth
> Amendment, their argument is foreclosed by the Supreme Court's
> decision in Gregg v. Georgia.  With respect to the defendants' Fifth
> Amendment due process claim, we observe that the language of the
> Due Process Clause itself recognizes the possibility of capital
> punishment.  Moreover, the defendants' argument that execution
> deprives individuals of the opportunity for exoneration . . . repeatedly
> has been made to the Supreme Court and rejected by the Supreme
> Court.  Most notably, the Supreme Court held in Herrera v. Collins,
> that while the Due Process Clause protects against government
> infringement upon rights that are so rooted in the traditions and
> conscience of our people as to be ranked as fundamental, there is no
> fundamental right to a continued opportunity for exoneration
> throughout the course of one's natural life.

Id. at 52 (internal citations and quotation marks omitted).  The Second Circuit further recognized

that the Supreme Court, since 1878, "has upheld challenges to death penalty statutes based upon

the Due Process Clause as well as the Eighth Amendment." Id. at 65 (collecting cases).

Specifically, in Furman, the Supreme Court "was presented with, considered, and declined to

adopt the argument that capital punishment unconstitutionally deprives innocent persons who

have been sentenced to death of the opportunity to exonerate themselves." Id. at 65-66.  And, in

Chapman v. United States, 500 U.S. 453, 456 (1991), the Supreme Court, considering the Due

Process Clause, held that:

> Every person has a fundamental right to liberty in the sense that the
> Government may not punish him unless and until it proves his guilt
> beyond a reasonable doubt at a criminal trial conducted in accordance
> with the relevant constitutional guarantees.  But a person who has
> been so convicted is eligible for, and the court may impose, whatever
> punishment is authorized by statute for his offense, so long as that
> penalty is not cruel and unusual, and so long as the penalty is not
> based on an arbitrary distinction that would violate the Due Process
> Clause of the Fifth Amendment.

Id. (citations omitted).  Finally, in Herrera v. Collins, 506 U.S. 390, 411 (1993), the Supreme

Court found no historical basis for a rule that no death-eligible defendant can be executed

because of the theoretical possibility that grounds for a motion for a new trial may someday

arise.  Defendant presents no arguments compelling the Court to depart from the reasoning of

those court of appeals that have rejected arguments based on the risk of executing innocent

persons under the FDPA.  See, e.g., Sampson, 486 F.3d at 28; Robinson, 367 F.3d at 290;

Quinones, 313 F.3d at 68-69.  Accordingly, the Court will not declare the FDPA, or the federal

death penalty itself, unconstitutional on these grounds.

**F.      Non-Statutory Aggravating Factors**

Defendant's sixth chief argument in favor of declaring the FDPA unconstitutional is that

the use of non-statutory aggravating factors, apart from victim impact, is unlawful because: (1)

the FDPA does not authorize the use of non-statutory aggravating factors; (2) the use of non-

statutory aggravating factors leads to the imposition of arbitrary and capricious death sentences;

and (3) allowing prosecutors to define non-statutory aggravating factors violates the ban on ex

post facto laws.  (Doc. No. 706 at 164-71.)  The Court will address each argument in turn.

### 1.    The Use of Non-Statutory Aggravating Factors

Defendant's argument that the FDPA does not authorize the use of non-statutory

aggravating factors is based on a purported contradiction between two statutory sections of the

FDPA, 18 U.S.C. § 3591(a) and 18 U.S.C. § 3592(c).  (Id. at 166.)  Section 3591(a) provides that

a defendant who has been convicted of a death-eligible offense and been found to have acted

with the requisite intent set forth in Section 3591(a)(2) "shall be sentenced to death if, after

consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to

section 3593, it is determined that imposition of a sentence of death is justified."  Section

3592(c) provides:

> In determining whether a sentence of death is justified for an offense
> described in section 3591(a)(2), the jury, or if there is no jury, the
> court, shall consider [sixteen statutory aggravating factors] for which
> notice has been given and determine which, if any, exist . . . .
>
>  . . . .
>
> The jury, or if there is no jury, the court, may consider whether any
> other aggravating factor for which notice has been given exists.

Defendant argues that Section 3591(a) contradicts Section 3592(c) because, although Section

3591(a) states that a defendant may be sentenced to death only after the jury considers the

statutory aggravating factors set forth in Section 3592, the latter section also permits the jury to

consider non-statutory aggravating factors for which notice is given.  (Doc. No. 706 at 167.)

Defendant recognizes that his argument has been rejected as "hyper-literal."  (Id. (citing

United States v. Nguyen, 928 F. Supp. 1525, 1535 (D. Kans. 1996)).)  In Nguyen, the court held

that "[a] statute should be construed, if possible, in such a way that all of its provisions can be

given effect, and so that no part of the statute is rendered inoperative or superfluous. [Defendant's] strained and hyper-literal reading of § 3591(a) would render large portions of § 3592 inoperative." 928 F. Supp. at 1536 (internal citations omitted). Other courts have adopted this reasoning. For example, in <u>Llera Plaza</u>, the United States District Court for the Eastern District of Pennsylvania stated:

> Consistency . . . demands that in reading § 3591(a), the phrase "the factors set forth in section 3592" must be taken to comprehend only statutory aggravating factors. However, this is not to say that the defendants are correct that § 3591(a) undermines the government's authority, under the catch-all sentence of § 3592(c), to articulate and attempt to establish nonstatutory aggravating factors. To reiterate, § 3591(a) authorizes the sentencer to impose the death penalty if it finds such a sentence justified "after consideration of the factors set forth in section 3592." Section 3591(a) thus affirmatively directs the sentencer to include statutory factors in its calculus; however, it does not prohibit the sentencer from including non-statutory aggravating factors as well – or, for that matter, mitigating factors. Simply because consideration of one type of factor is mandated does not mean that consideration of other types of factors is precluded.
>
> To construe § 3591(a) so narrowly as to nullify the catch-all sentence of § 3592(c) authorizing the use of non-statutory aggravating factors would violate the longstanding cannon of statutory construction that terms in a statute should not be construed so as to render any provision of the statute meaningless or superfluous.

179 F. Supp. 2d at 459 (internal quotations omitted); <u>see also</u> <u>United States v. Hammer</u>, No. 96-cr-239, 2011 WL 6027771, at *4 (M.D. Pa. Dec. 1, 2011) (collecting cases). Moreover, as the Government points out, non-statutory aggravating factors serve the constitutional need for individualized sentencing because it would be impossible to identify every possible relevant consideration in any given capital case.[4] (Doc. No. 756 at 39 (citing <u>United States v. Bin Laden</u>,

---

[4] To the extent that Defendant contends that non-statutory aggravating factors must be alleged in an indictment under the FDPA, this argument is without merit. <u>See, e.g.</u>, <u>Fell</u>, 531

126 F. Supp. 2d 290, 302 (S.D.N.Y. 2001)).)  Thus, the Court rejects Defendant's argument.

### 2.    Eighth and Fourteenth Amendments

Next, Defendant argues that the use of non-statutory aggravating factors runs afoul of the requirement that "the decision to impose death must be guided by 'carefully defined standards that must narrow a sentencer's discretion.'" (Doc. No. 706 at 168 (quoting McCleskey, 481 U.S. at 304).)  He asserts that "construing section 3592(c) as authorizing the [G]overnment to unilaterally expand the list of aggravating factors on a case-by-case basis injects into capital proceedings precisely the uncertainty and disparate case results that Furman found to violate the Eighth Amendment."  (Id. at 169.)  He points out that the FDPA is silent with respect to the process under which prosecutors may define or select non-statutory aggravating factors.  (Id.)

In order to properly guide the discretion of the jury, a capital sentencing system must: "(1) rationally narrow the class of death-eligible defendants[] and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime."  Marsh, 548 U.S. at 174.  Allowing the jury to consider non-statutory aggravating factors in addition to statutory aggravating factors permits them to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of the crime. Hammer, 2011 WL 6027771, at *4 (citing United States v. Glover, 43 F. Supp. 2d 1217, 1228-29 (D. Kan. 1999)); United States v. Kacynski, No. 96-cr-259, 1997 WL 34626785, at *4 (E.D. Cal.

_____

F.3d at 237-38 ("[The] government's failure to include the non-statutory aggravating factors in the indictment did not violate the Fifth Amendment."); Higgs, 353 F.3d at 299 ("Because nonstatutory aggravating factors do not increase the available punishment to which a defendant might be subjected, they are not required to be alleged in the indictment.").

Nov. 7, 1997)).  This approach is consistent with the Supreme Court's direction that the sentencing decision should be an "individualized determination on the basis of the character of the individual and the circumstances of the crime."  Zant v. Stephens, 462 U.S. 862, 879 (1983).  Non-statutory aggravating factors need only be considered after the jury finds the requisite intent and at least one statutory aggravating factor, a process which narrows the class of defendants eligible to receive the death penalty. Thus, the Court finds that the use of non-statutory aggravating factors properly guides the jury's discretion and avoids the arbitrary and capricious imposition of death sentences.

### 3.     Ban on Ex Post Facto Laws

Finally, Defendant argues that the use of non-statutory aggravating factors violates the ban on ex post facto laws set forth in Article I, Section 9 of the Constitution.  (Doc. No. 706 at 170-71.)  Defendant asserts that non-statutory aggravating factors "are just as necessary to a jury's finding that the death penalty shall apply as are statutory aggravating factors."  (Id. at 171.)  Reasoning from this premise, he argues that because 18 U.S.C. § 3592 "permits the prosecution to manufacture out of whole cloth aggravating factors to be applied retroactively to crimes committed before the aggravating factors are identified," it "makes more burdensome the punishment for a crime, after its commission."  (Id. at 170.)

The Court rejects the contention that non-statutory aggravating factors are "just as necessary" in this context as statutory aggravating factors.  See, e.g., United States v. Allen, 247 F.3d 741, 759 (8th Cir. 2001) (rejecting an ex post facto argument because the non-statutory aggravating factors are not used to determine a defendant's eligibility for the death penalty).  Non-statutory aggravating factors do not constitute the functional equivalent of elements of a

crime because, by virtue of the fact that they are weighed only once the defendant is found eligible for the death penalty, "[t]hey do not increase the possible punishment or alter the elements of the offense." Higgs, 353 F.3d at 322. Consequently, the use of non-statutory aggravating factors does not implicate the ex post facto clause.

### G. Evolving Standards of Decency

Defendant's final argument in support of his motion to strike the Government's amended notice of intent to seek the death penalty in its entirety is that this Court should find that the federal death penalty is unconstitutional per se because it constitutes cruel and unusual punishment and violates the Due Process Clause. (Doc. No. 706 at 171-75.) Defendant's argument reiterates the grounds for several of his earlier claims:

> (1) the death penalty is racist to its very core; (2) the death penalty has in the past, and inevitably will in the future, lead to the execution of innocent people; (3) the process by which individuals are selected for capital prosecution vests an unacceptable level of unreviewable discretion in prosecuting authorities, producing irreconcilable inconsistencies; (4) there is no principled basis for distinguishing between defendants who are sentenced to death from defendants who are not; and (5) . . . evolving standards of decency have reached the point where this court can declare that the death penalty is no longer consistent with the values embodied in the Eighth Amendment.

(Id. at 172.) But Defendant also recognizes that "a majority of the United States Supreme Court accepts the proposition that the death penalty, under some circumstances, is constitutional." (Id. at 171.) Because this Court is bound by Supreme Court precedent, Defendant's claim that the death penalty is unconstitutional per se must be rejected. See, e.g., Quinones, 313 F.3d at 61-62 ("[T]he Supreme Court expressly held in Gregg that, to the extent our standards of decency have evolved since the enactment of the Constitution, they still permit punishment by death for certain heinous crimes such as murder.") (citing Gregg, 428 U.S. at 186-87).

## II.  MOTIONS TO STRIKE PARTICULAR AGGRAVATING FACTORS

In the alternative, Defendant moves to strike certain statutory and non-statutory aggravating factors from the penalty phase of this action, should one be reached.  (Doc. Nos. 688, 690, 694, 696, 698, 700, 703.)  The Government's amended notice of intent to seek the death penalty against Defendant alleges the following statutory factors justifying a sentence of death:

1.  **Previous convictions for violent felonies involving firearms**.  The defendant has previously been convicted of Federal or State offenses punishable by a term of imprisonment of more than one year, involving the use or attempted or threatened use of a firearm (as defined in 18 U.S.C. § 921) against another person.  18 U.S.C. § 3592(c)(2).

2.  **Previous convictions of offense for which a sentence of life imprisonment was authorized**.  The defendant has previously been convicted of another Federal or State offense resulting in the death of a person, for which a sentence of life imprisonment was authorized by Statute.  18 U.S.C. § 3592(c)(3).

3.  **Heinous, cruel, or depraved manner of committing the offense**.  The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim.  18 U.S.C. § 3592(c)(6).

4.  **Substantial planning and premeditation**.  The defendant committed the offense after substantial planning and premeditation to cause the death of a person.  18 U.S.C. § 3592(c)(9).

(Doc. No. 506-2 at 2-3.)

The amended notice also contains the following non-statutory aggravating factors:

**Future Dangerousness of the Defendant.**  The defendant represents a continuing danger to the lives and safety of other persons.  The

defendant has committed the acts alleged in the capital offense charged in the Indictment and in the statutory and non-statutory aggravating factors contained in this Notice, and, in addition, has committed and exhibited acts and characteristics including but not limited to the following:

> **Low Rehabilitative Potential.** The defendant demonstrated a low potential for rehabilitation as evidenced by, among other things, his involvement in numerous disciplinary infractions in prison while serving his sentence of confinement, including preparations on two occasions to escape from custody.

> **Victim Impact**. As demonstrated by the victim's personal characteristics as an individual human being and the impact of the death upon the victim and the victim's family and friends, the defendant caused injury, harm, and loss to the victim and the victim's family and friends, including but not limited to Gertrude Boursaw, Dustin Allery, James Renville, Natalie Allery, and Rita Hochstein.

(Doc. No. 506-2 at 3-4.) During a hearing held on May 7, 2012, counsel for the Government clarified that Ms. Boursaw, Mr. Allery, Mr. Renville, Ms. Allery, and Ms. Hochstein were the mother, nephew, brother, daughter, and sister of the victim, Alvin Allery, respectively.

### A.     Legal Framework

As discussed, the FDPA sets forth the findings that a jury must make during the penalty phase of a capital action. First, the jury must decide whether the defendant is eligible for the death penalty. In making this determination in a case where the defendant has been found guilty of murder, the jury must find that the defendant acted with the requisite "intent" pursuant to 18 U.S.C. § 3591(a)(2) and that the Government proved the existence of at least one statutory aggravating factor beyond a reasonable doubt. 18 U.S.C. §§ 3592(c), 3593(c), (e); see also Tuilaepa v. California, 512 U.S. 967, 971 (1994). If the jury makes these findings, they must then consider whether all the aggravating factors found to exist sufficiently outweigh the

mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. 18 U.S.C. § 3593(e). Although the jury may only consider an aggravating factor if it is unanimously found to exist beyond a reasonable doubt, a juror who finds that a mitigating factor has been proven beyond a preponderance of the evidence may consider that factor regardless of whether all jurors concur that the factor has been so proven. Id. §§ 3593(c)-(d). During all stages, this process must be "neutral and principled so as to guard against bias or caprice in the sentencing decision." Tuilapea, 512 U.S. at 973.

"[A]ggravating circumstances must be construed to permit the sentencer to make a principled distinction between those who deserve the death penalty and those who do not." Lewis v. Jeffers, 497 U.S. 764, 776 (1990). Courts have developed several guideposts for assessing the adequacy of an aggravating factor. First, an aggravating factor cannot be unconstitutionally overbroad or vague. Tuilapea, 512 U.S. at 972; Arave v. Creech, 507 U.S. 463, 473-74 (1993). The Supreme Court has observed that a factor is overbroad "if the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty." Arave, 507 U.S. at 474; see also Tuilapea, 512 U.S. at 972 (stating that an aggravating factor "may not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder"). And the Court has held that a factor is impermissibly vague when it lacks "some common-sense core of meaning . . . that criminal juries should be capable of understanding." Tuilapea, 512 U.S. at 973.

Second, the aggravating factor must be "sufficiently relevant to the question of who should live and who should die," and, even if the factor is relevant, evidence in support of it may

be excluded "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c); United States v. Grande, 353 F. Supp. 2d 623, 634 (E.D. Va. 2005); see also United States v. Solomon, 513 F. Supp. 2d 520, 526 (W.D. Pa. 2007) ("If the aggravator has only a tangential relationship to a determination of who is more worthy of receiving a sentence of death, it should be excluded from the sentencer's review.") The Court, however, while ensuring that information submitted in the penalty phase meets the "heightened reliability" requirements of capital sentencing, should generally admit "as much information as possible to allow the jury to make an individualized determination" of whether the defendant should receive a death sentence. Lockett, 438 U.S. at 604; United States v. Fell, 360 F.3d 135, 143 (2d Cir. 2004); Solomon, 513 F. Supp. 2d at 526.

Finally, some courts have held that an aggravating factor cannot duplicate another aggravating factor. See United States v. McCullah, 76 F.3d 1087, 1111-12 (10th Cir. 1996); Tipton, 90 F.3d at 899; but see Purkey, 428 F.3d at 762; Robinson, 367 F.3d at 293-93. "The concern is that aggravating factors 'that duplicate each other may impermissibly skew a jury in favor of imposing the death penalty.'" Solomon, 513 F. Supp. 2d at 526 (quoting United States v. Regan, 228 F. Supp. 2d 742, 751 (E.D. Va. 2002)).

B.      **Statutory Aggravating Factors**

Defendant raises three principal contentions in support of his motions to strike the statutory aggravating factors from the amended notice. First, he contends that the two aggravating factors relating to his prior convictions are unconstitutionally duplicative. (Doc. No. 690.) Second, he asserts that the aggravating factor of "substantial planning and premeditation" is unconstitutionally vague and overbroad. (Doc. No. 698.) Finally, he argues that the

aggravating factor of "heinous, cruel, or depraved manner of committing the offense" is

impermissibly vague. (Doc. No. 703.) The Court will address each argument in turn.

### 1. Previous Convictions

Defendant first contends that the two statutory aggravating factors relating to his previous

convictions are unconstitutionally duplicative and, as a result, the Court should strike one of the

factors from the amended notice. (Doc. No. 690 ¶¶ 11, 13.) The first factor alleged in the

amended notice states that Defendant was previously convicted of an offense involving the use

of a firearm against another person, and the second factor states that Defendant was previously

convicted of an offense resulting in the death of a person, for which a minimum sentence of life

imprisonment was authorized by statute. (Doc. No. 506-2 at 2-3 (citing 18 U.S.C. §§ 3592(c)(2)-

(3)).) In support of these factors, the Government intends to introduce evidence that, on

November 21, 2002, Defendant pleaded guilty to the charges of second-degree murder and

intentional use of a firearm during a crime of violence. (Doc. No. 690 ¶¶ 4-5; Doc. No. 750 at

8.) Both offenses arise from events that took place on June 8, 2002. (Id.)

As the Second Circuit has observed, "the circuit courts are split as to whether duplicative

aggravating factors are unconstitutional." Fell, 531 F.3d at 235 n.26. Neither the Supreme Court

nor the United States Court of Appeals for the Third Circuit has resolved the question. The

United States Court of Appeals for the Tenth Circuit, however, has cautioned that "double-

counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the

weighing process and creates the risk that the death sentence will be imposed arbitrarily and

thus, unconstitutionally." McCullah, 76 F.3d at 1111. But the Tenth Circuit has limited this

holding to situations where two factors "substantially overlap" such that one factor "necessarily

subsumes the other" and has also clarified that two factors are not duplicative merely because they utilize the same evidence.  Id.; Johnson v. Gibson, 169 F.3d 1239, 1252 (10th Cir. 1999).  In other words, under McCullah, factors relying on similar evidence are not necessarily unconstitutional.

In Jones v. United States, 527 U.S. 373, 398 (1999), the Supreme Court declined to hold that duplicative factors are necessarily constitutionally invalid.  Reviewing a decision of the Fifth Circuit – reasoning that "[i]f the jury has been asked to weigh the same aggravating factor twice, the appellate court cannot assume that 'it would have made no difference if the thumb had been removed from death's side of the scale'" – the Court asserted that the weighing process is skewed only when the jury considers an invalid factor.  Id.; United States v. Jones, 132 F.3d 232, 251 (5th Cir. 1998) (quoting Stringer v. Black, 503 U.S. 222, 232 (1992)).  The Court made clear that it has "never before held that aggravating factors could be duplicative so as to render them constitutionally invalid."  Jones, 527 U.S. at 398.  Further, it found that a trial court's instruction that factors should be weighed qualitatively rather than quantitatively eliminates any risk of skewing the weighing process.  Id. at 399-400.

Since the issuance of McCullah and Jones, no uniform approach has been adopted by the appellate courts.  Because the Third Circuit has yet to rule on the issue, the Court has available two established approaches to the issue: the Tenth Circuit's approach, which has been adopted by the United States Court of Appeals for the Fourth and Ninth Circuits, or the alternative approach developed by the Fifth and Eighth Circuits.  See Allen v. Woodford, 395 F.3d 979, 1012-13 (9th Cir. 2005); Purkey, 428 F.3d at 762; Robinson, 367 F.3d at 292-93; Tipton, 90 F.3d at 900.  On careful review, the Court is persuaded by the approaches taken by the Fifth and

Eighth Circuits, supported, in part, by the Supreme Court's decision in <u>Jones</u> to avoid declaring duplicative aggravating factors unconstitutional despite having the opportunity to do so.

In <u>Purkey</u>, the Eighth Circuit found that the non-statutory aggravating factor of "substantial criminal history" duplicated the statutory aggravating factor relating to the defendant's prior convictions because, to prove both factors, the Government used the same set of convictions. 428 F.3d at 762. Despite the duplication, the Eighth Circuit held that the use of both factors was not unconstitutional because the Supreme Court "never before [has] held that aggravating factors could be duplicative so as to render them constitutionally invalid" and "the FDPA avoids arbitrary death sentences by requiring juries to weigh aggravating and mitigating factors rather than to tally the factors on each side and declare a winner based on sheer numbers." <u>Id.</u> (quoting <u>Jones</u>, 527 U.S. at 398).

The Court, adopting the reasoning of the Eighth Circuit, finds that, to the extent that the statutory aggravating factors relating to Defendant's prior convictions will be supported by the same operative facts, such duplication is not unconstitutional. In <u>Jones</u>, the Supreme Court only held that the weighing process may be impermissibly skewed only where the Government introduces an invalid aggravating factor. 527 U.S. at 373. Here, both of the aggravating factors are legitimate. Congress determined, in Section 3592(c)(2), that a defendant is deserving of greater condemnation if he has previously been convicted of an offense involving the use of a firearm and, in Section 3592(c)(3), that greater condemnation is warranted if the defendant has previously been convicted of another offense resulting in the death of a person, for which a sentence of life imprisonment or a sentence of death was statutorily authorized. The Court finds no reason to question Congress's judgment that defendants with these prior convictions are

deserving of enhanced punishment, and, under <u>Jones</u>, the Government is permitted to allege, and attempt to prove beyond a reasonable doubt, both factors.  Importantly, the Court will ensure that the jury does not employ a "tally method" of evaluating these factors, which could result in Defendant being unfairly prejudiced by the fact that a single criminal incident supports two enhancements.  The jury will be instructed that, in weighing all of the aggravating and mitigating factors, they must not simply "count each factor and reach a decision based on which number is greater; rather, they should individually consider the weight and value of each factor before deciding whether a sentence of death is justified."  <u>United States v. Bolden</u>, 545 F.3d 609, 625 (8th Cir. 2008).  Thus, the Court will deny Defendant's motion to strike one of the aggravating factors relating to his prior convictions as impermissibly duplicative.  (Doc. No. 690.)

### 2.      Substantial Planning and Premeditation

Next, Defendant argues that the statutory aggravating factor of substantial planning and premeditation should be stricken from the amended notice because the word "substantial" is unconstitutionally vague and the words "planning and premeditation" fail to narrow the class of persons who are eligible for the federal death penalty.  (Doc. No. 698 ¶¶ 4-5.)

Defendant's narrowing argument has been rejected by numerous courts.  <u>See</u> <u>Bourgeois</u>, 423 F.3d at 511 (finding that the substantial planning factor "obviously narrows the class of murderers who could be eligible for the death penalty because not every murder involves substantial planning or premeditation"); <u>Mayhew</u>, 380 F. Supp. 2d 936, 949 (S.D. Oh. 2005) (finding that the substantial planning "adequately assists the jury in distinguishing those who deserve capital punishment from those who do not") (citation and internal brackets and quotation marks omitted); <u>United States v. Minerd</u>, 176 F. Supp. 2d 424, 438-39 (W.D. Pa. 2001) (finding

that the factor "is sufficiently narrowing to provide the jury with guidance"). Principally, Defendant contends that the word, "substantial" fails to provide guidance to the jury regarding "how much" or "what kind of" planning and premeditation is necessary to constitute substantial planning and premeditation. (Doc. No. 699 at 6.) As a result, Defendant continues, this factor is inherently ambiguous and risks each juror interpreting a different definition of "substantial" in assessing the factor. (Id. at 8-11.)

The Court rejects Defendant's narrowing and vagueness arguments. First, the Court agrees with those courts that have found that the substantial planning factor satisfies the constitutional narrowing requirement. See, e.g., Bourgeois, 423 F. Supp. at 511; United States v. Cheever, 423 F. Supp. 2d 1181, 1203 (D. Kan. 2006). Second, the factor is not impermissibly vague because the word "substantial" has a "commonsense meaning of considerable in quantity: significantly large, which criminal juries are capable of understanding." McCullah, 76 F.3d at 1110 (citation and quotation marks omitted); see also United States v. Cooper, 754 F. Supp. 617, 623 (N.D. Ill. 1990) (rejecting a vagueness argument in the context of an analogous death penalty statute because the words, "premeditation" and "planning," are "commonly employed" and "universally understood," and the word, "substantial," is frequently used and understood). Finally, to the extent that the word "substantial" is inherently ambiguous, the Court finds that the substantial planning factor can be "rendered precise and concrete in the course of crafting instructions to the sentencing jury." Llera Plaza, 179 F. Supp. 2d at 449-50. As the court recognized in Hammer, counsel for both parties "will have the opportunity to participate fully in the process of formulating the instructions which will frame the jury's deliberations. Defendant offers no evidence that can overcome the assumption that juries will follow the instructions

given to them during the penalty phase hearing."  2011 WL 6020409, at *3.

Defendant further argues that the Government has failed to provide any discovery indicating that Defendant or Shawn Cooya, his former co-defendant, formulated a plan to murder Allery.  (Doc. No. 699 at 12.)  According to Defendant, "no evidence . . . [shows] that the conduct engaged in by Mr. Cooya or [Defendant] was pursuant to any planning or, if it was, who it was that created the plan."  (Id. at 13.)  In support, Defendant relies on United States v. Ebron, 683 F.3d 105, 152 (5th Cir. 2012), in which the Fifth Circuit held that the district court abused its discretion in submitting the aggravating factor of substantial planning to the jury because the record evidence indicated that the defendant acted in conformance with a plan developed by others rather than actually planning the victim's murder himself.  The Fifth Circuit made clear that "it is the defendant's substantial planning, and not that of any other individual, that matters in determining whether this aggravating factor has been satisfied."  Id.  Defendant contends that, like in Ebron, no evidence in this case indicates that Defendant engaged in substantial planning prior to the murder of Mr. Allery.  The Government does not respond to Defendant's argument based on Ebron but, rather, argues that, at this juncture, Defendant is not entitled to the specific proof that the Government will offer in support of the aggravating factors.  (Doc. No. 749 at 8-10.)  The Government, however, appears to assert that the video evidence, showing Defendant and Shawn Cooya attacking Allery, demonstrates that Defendant "engaged in carrying out what can only be viewed as a carefully planned and well-orchestrated murder plan, complete with weapons."  (Id. at 9 n.1.)  At this stage of the proceedings, the Court need not determine whether this evidence is sufficient, in and of itself, to support the substantial planning factor.  Therefore, the Court will deny Defendant's motion to strike the factor.  (Doc. No. 698.)  Following the

Government's presentation of its evidence supporting the factor during the penalty phase, Defendant may move to dismiss the factor, and the Court will then decide whether to submit the factor to the jury for their consideration.

### 3.　　　Especially Heinous, Cruel, or Depraved Manner

Next, Defendant moves the Court to strike the statutory aggravating factor of especially heinous, cruel, or depraved manner of committing the offense ("heinous factor").  (Doc. No. 703.)  This factor, as alleged in the amended notice, states: "The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim."  (Doc. No. 506-2 at 3-4 (citing 18 U.S.C. § 3592(c)(6)).)  Defendant contends that this factor must be stricken because it is unconstitutionally vague and not supported by a sufficient factual basis.

Courts addressing vagueness challenges to the heinous factor have held that the factor is constitutional so long as the jury receives an instruction extensively defining "heinous, cruel, and depraved."  See, e.g., Jones, 132 F.3d at 249-50 (citations omitted); Mitchell, 502 F.3d at 975; United States v. Paul, 217 F.3d 989, 1001 (8th Cir. 2000); United States v. Frank, 8 F. Supp. 2d 253, 277-78 (S.D.N.Y. 1998).  Specifically, the jury must be instructed that the offense involved torture or serious physical abuse.[5]  See Maynard v. Cartwright, 486 U.S. 356, 365 (1988); Jones,

---

[5] The Fifth Circuit has defined the terms as follows:

> "Heinous" means extremely wicked or shockingly evil, where the killing was accompanied by such additional acts of torture or serious physical abuse of the victim as set apart from other killings.

> "Cruel" means that the defendant intended to inflict a high degree of pain by torturing the victim in addition to killing the victim.

132 F.3d at 249-50; Mitchell, 502 F.3d at 975; Sampson, 486 F.3d at 38.  Here, the Court will provide the jury with an instruction meeting these requirements, thereby alleviating any vagueness inherent in the factor.

Defendant further argues that the Court must strike the heinous factor because it is not supported by a sufficient factual basis.  (Doc. No. 704 at 6-13.)  In essence, he contends that

---

"Depraved" means that the defendant relished the killing or showed indifference to the suffering of the victim, as evidenced by torture or serious physical abuse of the victim.

"Torture" includes mental as well as physical abuse of the victim.  In either case, the victim must have been conscious of the abuse at the time it was inflicted; and the defendant must have specifically intended to inflict severe mental or physical pain or suffering upon the victim, apart from killing the victim.

"Serious physical abuse" means a significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, unconsciousness, extreme physical pain, substantial disfigurement, or substantial impairment of the function of a bodily member, organ, or mental faculty.  Serious physical abuse – unlike torture – may be inflicted either before or after death and does not require that the victim be conscious of the abuse at the time it was inflicted.  However, the defendant must have specifically intended the abuse apart from the killing.

Pertinent factors in determining whether a killing was especially heinous, cruel, or depraved include: infliction of gratuitous violence upon the victim above and beyond that necessary to commit the killing; needless mutilation of the victim's body; senselessness of the killing; and helplessness of the victim.

The word "especially" should be given its ordinary, everyday meaning of being highly or unusually great, distinctive, peculiar, particular, or significant.

Jones, 132 F.3d at 250 n.12.

because the autopsy report on Mr. Allery's death indicates that the blows Mr. Allery suffered to his head and torso were causative factors of his death, there is no evidence that Defendant inflicted injuries upon Mr. Allery beyond those that were necessary to cause his death. In support, Defendant points to Hammer in which the court did not submit the heinous factor to the jury because the Government failed to "prove a deliberate prolonging of suffering or application of force above and beyond that needed to cause the death of" the victim. (Doc. No. 704 at 8-9.) Likening Hammer to this case, Defendant argues that "the Government lacks the ability to present information which would support the finding beyond a reasonable doubt that the kicking engaged in was for purposes of causing mutilation of Mr. Allery and was conduct beyond what was needed to cause the death of Mr. Allery." (Id. at 9.) The court in Hammer, however, did not make a pretrial determination as to whether this aggravating factor would be submitted to the jury but, rather, made the determination following the Government's presentation of evidence in support of the factor during the penalty phase. (See Doc. No. 704-1.)

In response, the Government contends that it will present evidence that the stab wounds suffered by Mr. Allery were sufficient in and of themselves to cause Mr. Allery's death. (Doc. No. 748 at 9.) The subsequent kicking of Mr. Allery's head and torso, the Government continues, constitutes "gratuitous violence," resulting in Mr. Allery's "multiple rib fractures, contusions, lacerations, and abrasions, including a laceration of the spleen with associated hemorrhage." (Id.) In addition to the video evidence of the killing, the Government intends to introduce forensic evidence, testimony, and photographs. (Id. at 10.) Whether the Government's factual basis, if proven at trial, sufficiently establishes the heinous factor will be a question for the jury. At this juncture, the Court will not strike this aggravating factor based

upon allegations that there is insufficient evidence to support it.  See Jacques, 2011 WL

1675417, at *20; United States v. Rodriguez, 2006 WL 435581, at *6 (D.N.D. Feb. 21, 2006).

Accordingly, Defendant's motion challenging the heinous factor (Doc. No. 703) will be denied.

### C.   Non-Statutory Aggravating Factor of Future Dangerousness

Defendant also moves in three separate motions to strike the non-statutory aggravating

factor of future dangerousness.  (Doc. Nos. 688, 694, 700.)  In his motions, Defendant raises the

following eight arguments: (1) the future dangerousness factor is in conflict with congressional

intent; (2) the factor is misleading because it is not limited to the prison setting; (3) predictions

of future dangerousness are not reliable; (4) the language used in the factor lessens the

Government's burden of proof; (5) evidence of the sixteen disciplinary infractions he allegedly

committed during his incarceration may not be used to support the factor; (6) the generic

assertion of the factor, and the frequency with which the Government asserts it, fails to generally

narrow the class of death-eligible individuals or channel the jury's discretion; (7) the factor's

subpart regarding low rehabilitative potential is not relevant; and (8) the factor constitutes

impermissible duplication of the acts alleged in the statutory aggravating factors.  (Doc. Nos.

688, 694, 700.)  The Court will address each argument in turn.

### 1.   Legal Framework

Federal courts interpreting the FDPA have formulated a three-part test that the

Government must satisfy in order to present evidence in support of a non-statutory aggravating

factor during the penalty phase of a capital case.  See, e.g., United States v. Johnson, No. 01-cr-

3046, 2013 WL 163463, at *42-*43 & n.17 (N.D. Iowa Jan. 16, 2013); United States v .Gilbert,

120 F. Supp. 2d 147, 150-54 (D. Mass. 2000).  "First, the information must be relevant.  The

provision on nonstatutory aggravating factors allows the introduction only of relevant information (of which the Government has given notice) that may tend to make the death penalty more appropriate." Gilbert, 120 F. Supp. 2d at 150 (citing 18 U.S.C. § 3593(a)(2)) (internal citation and quotation marks omitted). To be relevant, the factor "must [be] sufficiently relevant to the consideration of who should live and who should die." United States v. Davis, 912 F. Supp. 938, 943 (E.D. La. 1996). Put differently, the evidence supporting the factor must be "particularly relevant to the sentencing decision" and "not merely relevant, in some generalized sense, to whether [the] defendant might be considered a bad person." Gregg, 428 U.S. at 192; Gilbert, 120 F. Supp. 2d at 151.

Second, "because death penalty cases are inherently different, the Supreme Court requires the 'factfinding procedures aspire to a heightened standard of reliability' in the determination that death is the appropriate punishment in a specific case." United States v. Duncan, No. 07-cr-23, 2008 WL 711603, at *7 (D. Idaho Mar. 14, 2008) (quoting Ford v. Wainwright, 477 U.S. 399, 411 (1986)); Gilbert, 120 F. Supp. 2d at 150. The Supreme Court "explained that the need for greater reliability in the selection of an appropriate punishment entails not stricter evidentiary rules, but the assurance of 'individualized sentencing' once the defendant is eligible for the death penalty." United States v. Fields, 483 F.3d 313, 336 (5th Cir. 2007) (citing Woodson v. North Carolina, 428 U.S. 280, 304 (1976)). "Indeed, some information that might be admitted in a normal sentencing hearing will be insufficiently reliable for the jury to use in considering whether a defendant should be put to death." Gilbert, 120 F. Supp. 2d at 151 (citing Davis, 912 F. Supp. at 943).

Third, even if the proposed information is relevant and reliable, "proposed aggravating

factors may be excluded if their probative value is outweighed by the danger of unfair prejudice to the defendant, confusion of the issues, or a likelihood that the jury will be misled." Id. at 150 (citing 18 U.S.C. § 3593(c)). This weighing process must be performed "more carefully in a death penalty case than in a normal case." Id.

The Supreme Court, however, "has also stressed the importance of presenting to the jury all relevant evidence in a capital case." Duncan, 2008 WL 711603, at *7 (citing Jurek, 428 U.S. at 276; Lockett, 438 U.S. at 608; Estelle, 463 U.S. at 896; Payne v. Tennessee, 501 U.S. 808 (1991)); see also United States v. Basciano, No. 05-cr-060, 2011 WL 114865, at *47 (E.D.N.Y. Jan. 12, 2011) (recognizing that courts "should lean in favor of admitting as much information as possible to allow the jury to make an individualized determination of whether the defendant merits the death penalty"). The FDPA employs a "procedural framework at capital sentencing that adequately balances (1) the requisite access to a wide range of information to achieve individualized sentences and (2) the need to protect defendants from being sentenced on the basis of misinformation of a constitutional magnitude." Fields, 483 F.3d at 338 (quotations omitted). Although the Federal Rules of Evidence do not apply at capital sentencing, the FDPA "provides that a defendant may rebut any information received at a hearing and must be given a fair opportunity to present argument as to the adequacy of the information presented to establish the existence of any aggravating or mitigating factor." Id.; 18 U.S.C. § 3593©).

### 2. Congressional Intent

Defendant first argues that, because Congress did not include future dangerousness among the sixteen aggravating factors enumerated in the FDPA, Congress did not intend for the

factor to be used to support the imposition of the death penalty. (Doc. No. 689 at 1-3.) More specifically, Defendant asserts that many state death-penalty sentencing schemes allow evidence suggesting that a defendant might be a danger in the future to be admitted in aggravation and that Congress is presumed to know the state of the law when it enacts new legislation. (Id. at 2-3.) Because Congress did not include future dangerousness as a statutory aggravating factor, Defendant asserts that the Court should infer that Congress did not intend for it to be used under the FDPA.

This argument lacks merit. The FDPA explicitly provides that a jury "may consider [the sixteen enumerated factors as well as] any other aggravating factor for which notice has been given exists." 18 U.S.C. § 3592(c). Thus, "[t]he plain text of the FDPA . . . authorizes the use of factors not specifically enumerated in the statute." Barnes, 532 F. Supp. 2d at 643; see also Hammer, 2011 WL 6027771, at *4 (collecting cases). Moreover, if Congress intended for future dangerousness to be excluded under the FDPA, "it would have limited the language of § 3592(c) to so state." United States v. Concepcion Sablan, 555 F. Supp. 2d 1177, 1180 (D. Col. 2006). Thus, the Court will not strike the factor on this ground.

### 3. Limitation to the Prison Setting

Defendant next argues that the future dangerousness factor must be stricken as misleading because it does not explicitly limit the jury's consideration to the prison setting. (Doc. No. 689 at 3-4.) Such a limitation is necessary, Defendant contends, because the minimum sentence he may receive is life imprisonment without the possibility of release.

The Supreme Court has held that "where a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment

without the possibility of parole, due process entitles the defendant 'to inform the jury of his parole ineligibility, either by jury instruction or in arguments by counsel.'"  Shafer v. South Carolina, 532 U.S. 36, 39 (2001) (quoting Ramdass v. Angelone, 530 U.S. 156, 165 (2000) and citing Simmons v. South Carolina, 512 U.S. 154 (1994)) (internal brackets omitted).  Following this precedent, the Eighth and Tenth Circuits have rejected the argument that, in cases where the only alternative sentence to death is life imprisonment, the future dangerousness factor must be limited to the prison setting.  United States v. Fields, 516 F.3d 923, 942-43 (10th Cir. 2008); United States v. Allen, 247 F.3d 741, 748 (8th Cir. 2001).  In Allen, the Eighth Circuit held that a future dangerousness factor, not so limited, was properly submitted to the jury because:

> A defendant in prison for life is still a risk to prison officials and to other inmates, and even though a life sentence without the possibility of parole greatly reduces the future danger to society from that particular defendant, there is still a chance that the defendant might escape from prison or receive a pardon or commutation of sentence.

247 F.3d at 748.  And, the Tenth Circuit, relying on Allen, held that "an explicit prison-setting limitation need not be included in a future-dangerousness aggravator" so long as "the jury is clearly informed that the Defendant would not be eligible for parole if a life sentence were imposed." 516 F.3d at 942-43.

Defendant advances no reason compelling the Court to reject the reasoning of the Eighth and Tenth Circuits.  The Court, however, recognizing the potential prejudice to Defendant if the jury were to consider any penalty less than life imprisonment, will instruct the jury that a sentence of life imprisonment without the possibility of parole will be imposed if they find that a sentence of death is not justified.  This instruction will eliminate any prejudice or confusion relating to the wording of the future dangerousness factor.

### 4.    Reliability

Next, Defendant moves the Court to strike the future dangerousness factor on the basis that any inquiry into future dangerousness is unreliable.  (Doc. No. 689 at 3-9.)  It is well settled that the jury may assess a defendant's propensity to commit future acts of violence as an aggravating factor during the penalty phase of a capital case.  See, e.g., Jurek v. Texas, 428 U.S. 262, 274-75 (1976); Umana, 707 F. Supp. 2d 621, 633-34 (W.D.N.C. 2010).  In Jurek, the Supreme Court recognized:

> It is, of course, not easy to predict future behavior.  The fact that such a determination is difficult, however, does not mean that it cannot be made.  Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system.  The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct.  And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.  For those sentenced to prison, these same predictions must be made by parole authorities.  The task that a [capital sentencing jury] must perform in answering the . . . question [of future dangerousness] is thus basically no different from the task performed countless times each day throughout the American system of criminal justice.  What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.

428 U.S. at 274-75 (footnotes omitted).

The Supreme Court has also held that the Government may present expert opinion testimony regarding a defendant's future dangerousness.  Barefoot v. Estelle, 463 U.S. 880, 897-99 (1983).  In Estelle, the petitioner argued that "expert testimony about future dangerousness is far too unreliable to be admissible."  Id. at 898.  Although the Supreme Court recognized that experts were not in agreement about the accuracy of such predictions, the Court was "not

persuaded that such testimony is almost entirely unreliable and that the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." Id. at 899. The Court concluded that, despite the questionable accuracy and usefulness of predictions of future dangerousness, consideration of future dangerousness was not unconstitutional because "[a]ll of these professional doubts about the usefulness of psychiatric predictions can be called to the attention of the jury." Id. at 899 n.7.

In essence, Defendant agues that, since Estelle, numerous studies have demonstrated that neither experts nor jurors are able to accurately predict the future dangerousness of capital defendants. For example, he cites studies indicating that predictions of future dangerousness are often wrong and that advancements in federal correctional facilities have reduced violence in prisons. (Doc. No. 689 at 6-8.) As the Government points out, however, Defendant points to no legal authority adopting this reasoning or striking down the future dangerousness factor on this basis. (Doc. No. 755 at 7.) Indeed, courts have rejected nearly identical arguments advanced by capital defendants. For example, in Umana, the United States District Court for the Western District of North Carolina found that studies such as those referenced here were "not legitimate grounds for a district court to question the continuing validity of" Jurek and Estelle. 707 F. Supp. 2d at 634. The court also noted that the Supreme Court explicitly recognized in Estelle that predictions of future dangerousness were often wrong but that this did not render consideration of the future dangerousness factor unconstitutional. Id. at 634-35. Other courts have reached similar conclusions. See Casey v. United States, No. 05-cr-277, 2012 WL 6645702, at *2 (D.P.R. Dec. 20, 2012) (rejecting the "assertions that all evidence relating to future dangerousness must be unduly prejudicial because of an alleged lack of reliability in the

opinions of experts and juries regarding defendants' potential for future dangerous behavior");

United States v. Bradley, 880 F. Supp. 271, 287 (M.D. Pa. 1994) (holding that evidence of the

defendant's continuing threat to society was a permissible non-statutory aggravating factor so

long as the Government submitted sufficient and relevant evidence). Accordingly, the Court will

not strike the future dangerousness factor on this basis.[6]

### 5. Burden of Proof

Next, Defendant argues that because the future dangerousness factor states that he

"represents a continuing danger to the lives and safety of other persons," the factor improperly

suggests that the Government's burden of proof is less than that required by the FDPA. (Doc.

No. 689 at 9-10.) Specifically, he avers that "[t]his language calls upon the jurors to decide, not

whether [Defendant] will commit other acts of violence in prison, but whether he might." (Id.

(emphasis added).)

"Future dangerousness is best defined as evidence that a defendant is 'likely to commit

criminal acts of violence in the future that would be a threat to the lives and safety of others.'"

---

[6] Defendant requests that the Court hold an evidentiary hearing on this issue and require
the Government to present evidence "that a jury of laypersons is [capable] of accurately
distinguishing those defendants convicted of capital murder who present a future danger from
those who do not." (Doc. No. 689 at 9.) The Government, however, need not make such a
showing in order to present evidence of future dangerousness during the penalty phase of this
capital trial. As discussed, the Supreme Court made clear in Jurek and Estelle that a jury can
make predictions concerning a defendant's future dangerousness despite the fact that such
predictions are often wrong.

Moreover, in its brief, the Government asks the Court to disregard the studies cited by
Defendant as well as the expert testimony of Drs. Mark Cunningham and Thomas Reidy and,
instead, conclude that the jury in this case "is, in fact, capable of determining whether . . .
Defendant is likely to be a future danger." (Doc. No. 755 at 12-13.) Defendant, however, has
not indicated to the Court that he plans to present these studies or the testimony of these, or any
other, witnesses during the penalty phase of the trial. Thus, the Court need not assess the
admissibility of this evidence at this juncture.

United States v. Basham, 561 F.3d 302, 331 (4th Cir. 2009) (quoting United States v. Bernard, 299 F.3d 467, 482 (5th Cir. 2002)).  Courts have rejected the argument that future dangerousness factors containing similar language to that used in the Government's amended notice lessens the Government's burden of proof.  See Umana, 707 F. Supp. 2d at 634; United States v. Williams, No. 05-cr-920, 2008 WL 4644830, at *6 (C.D. Cal. Oct. 15, 2008) (refusing to strike the future dangerousness factor because it contained the term "is likely" on the basis that "[i]t is not illogical to say that the jury must find that Defendant is likely to commit future criminal acts beyond a reasonable doubt").  And other courts have submitted future dangerousness factors, containing the exact same language presented here, to the jury.  See, e.g., United States v. Wilson, 493 F. Supp. 2d 526, 531 (E.D.N.Y. 2007) (providing in the jury charge for the penalty phase that "Defendant represents a continuing danger to the lives and safety of other persons").  Accordingly, the Court rejects Defendant's argument that the language of the future dangerousness factor lessens the Government's burden of proof.  The Court will, however, instruct the jury that they must find this factor beyond a reasonable doubt.

### 6.     Disciplinary Infractions

In his second motion regarding the future dangerousness factor, Defendant argues that the Government may not present evidence of the alleged disciplinary infractions he committed while incarcerated because the infractions are trivial, remote, irrelevant, involve unadjudicated conduct, and lack reliability.  (Doc. No. 694.)  In the alternative, he requests an evidentiary hearing to determine whether the specific evidence the Government seeks to present is relevant and reliable.

In his motion, Defendant avers that the Government provided him with documents from

the Bureau of Prisons, listing the following sixteen disciplinary infractions:

1.   On April 11, 2012, at USP Terre Haute, Inmate Williams was charged with refusing to obey an order, a Section 307 violation.

2.   On November 29, 2009, at USP Terre Haute, Defendant Williams was charged with the offense of assaulting a correctional officer without serious injury. The code for the charge [is] 224A.

3.   On October 25, 2009, at USP Lewisburg, Defendant Williams was charged with a Code 218 violation, destroying Government property with a value over $100. The ordered restitution was only in the amount of $60.

4.   On April 10, 2009, Defendant Williams was charged with a Code 212 violation for engaging in a group demonstration.

5.   On February 26, 2009, Defendant Williams was charged with a Code 224 violation, assaulting without serious injury.

6.   On December 15, 2008, Defendant Williams was charged with a Code 224 violation for assaulting without serious injury, allegedly striking a staff member during a forced cell move.

7.   On December 15, 2008, Defendant Williams was charged with a Code 218 violation for destroying property with a value over $100.

8.   On December 15, 2008, Defendant Williams was charged with a Code 224 violation, assaulting without serious injury.

9.   On May 6, 2007, Defendant Williams was charged with a Code 307 violation for refusing to obey an order.

10.  On May 6, 2007, Defendant Williams was charged with a Code 218 violation for destroying property over $100.

11.  On November 2, 2006, Defendant Williams was charged with a Code 218 violation for destroying property over $100.

12.  On October 28, 2006, Defendant Williams was charged with

a Code 320 violation for failing to stand for count.

13.    On June 11, 2006, Defendant Williams was charged with attempted escape.

14.    On May 17, 2005, (prior to the death of Mr. Allery) Mr. Williams was charged with a Code 222 violation for possessing intoxicants.

15.    On January 23, 2005, Mr. Williams was charged with a Code 222 violation for possessing intoxicants.

16.    On June 8, 2003, Mr. Williams was charged with a Code 201 violation for fighting with another person.

(Id. ¶ 6.)

Defendant contends that these events, which all constitute unadjudicated conduct, are not probative of the issue of whether he represents a continuing danger to other persons and, to the extent that any of these events has probative value, such value is outweighed by the danger of unfair prejudice, confusion of issues, and misleading the jury.  (Id. ¶ 8; Doc. No. 695 at 6.)  In support, he cites United States v. Friend, 92 F. Supp. 2d 535 (E.D. Va. 2000), and United States v. Diaz, No. 05-cr-167, 2007 WL 656831 (N.D. Cal. Feb. 28, 2007).  Neither Friend nor Diaz, however, support Defendant's contention.  Friend recognizes that no court "decision . . . has permitted unadjudicated misconduct not itself a crime to constitute a freestanding, nonstatutory aggravating factor."  92 F. Supp. 2d at 544 (emphasis added).  And, in Diaz, the court observed that "the 'overwhelming majority of federal courts has held that neither the Eighth Amendment nor the due process clause impose a per se barrier to the use of unadjudicated criminal conduct in capital sentencing.'" 2007 WL 656831, at *1 (quoting Gilbert, 120 F. Supp. 2d at 151-52).  Indeed, "every circuit to consider the issue has held that unadjudicated conduct may be considered in the process of assessing aggravating factors, and many courts have specifically

recognized the relevance to the factor of future dangerousness." United States v. Corley, 519 F.3d 716, 724 (7th Cir. 2008); see also Johnson, 2013 WL 163463, at *37 (collecting appellate decisions). Although there may be doubt as to whether unadjudicated conduct may be considered as an independent aggravating factor, there is little doubt that unadjudicated conduct can be considered in support of another aggravating factor, such as future dangerousness. See, e.g., Corley, 519 F.3d at 724 (explicitly holding that unadjudicated conduct may be considered in assessing the future dangerousness factor); Johnson, 2013 WL 163463, at *38. Here, the Government does not seek to present evidence of Defendant's disciplinary infractions as independent aggravating factors. Thus, the Court need not consider whether evidence of these incidents would be admissible as such.

Unadjudicated conduct, offered in support of the future dangerousness factor, however, is not automatically admissible. See, e.g., Corley, 519 F.3d at 724. As discussed, the Court must assess the relevance and reliability of the evidence as well as its prejudicial and probative impact. Here, the Court cannot make these determinations without further information regarding each individual disciplinary infraction. The Court, therefore, will order the Government to submit a proffer of the evidence it seeks to use to prove Defendant's future dangerousness. If necessary, following the Court's review of the Government's submission, the Court will hold an evidentiary hearing to assess the reliability, relevance, probative value, and prejudicial impact of the evidence. See id. (stating that the district court held an evidentiary hearing to determine the reliability of evidence of the defendant's unadjudicated conduct). The Court, however, will deny Defendant's motion to the extent that it seeks a ruling that evidence of the infractions, offered in

support of the future dangerousness factor, are <u>per</u> <u>se</u> inadmissible.[7]

### 7. Generic and Frequent Assertion of the Factor

Defendant next contends that the assertion that a capital defendant represents a future danger "is so routine as to make [the future dangerousness] factor worthless as a distinguishing criteria for the application of the death penalty." (Doc. No. 702 at 1.) In support, he cites studies indicating that future dangerousness has been alleged in approximately eighty percent of all federal capital trials. (<u>Id.</u> at 2.) This data, in Defendant's view, shows that the future dangerousness factor "fails to create a subclass of murder defendants, [and] it therefore fails to narrow the class of death-eligible defendants."[8] (<u>Id.</u> at 2-3.)

The future dangerousness factor is not "worthless as a distinguishing criteria for the application of the death penalty" merely because it is frequently asserted in capital cases. Evidence concerning Defendant's future dangerousness need not narrow the class of death-eligible defendants; rather, it need only be relevant to the jury's sentencing determination. <u>See</u> <u>Higgs</u>, 353 F.3d at 320; <u>Williams</u>, 2008 WL 4644830, at *6; <u>United States v. Gooch</u>, No. 04-cr-128, 2006 WL 3780781, at *28 (D.D.C. Dec. 20, 2006). Thus, the Court will not strike the

---

[7] The Court notes that Defendant also moves to strike the thirteenth disciplinary infraction, concerning his attempted escape from prison, on the basis that the Government raises no objection. Indeed, the parties have filed a stipulation stating that any reference to Defendant's attempted escapes shall not be submitted to the jury. (Doc. No. 760.) Accordingly, the Court will grant Defendant's motion to the extent it seeks to strike the thirteenth disciplinary infraction.

[8] Defendant also argues that the future dangerousness factor "fails in its purpose" because, despite the frequency with which it is alleged, data indicates that jurors are not capable of accurately predicting a defendant's future dangerousness. (<u>Id.</u> at 4.) The Court addressed, and rejected, this argument with respect to Defendant's first motion to strike the future dangerousness factor. <u>See</u> Section II.

factor merely because it is frequently alleged in capital cases.

### 8. Relevance of Low Rehabilitative Potential

Defendant next contends that the Court should strike from the Government's amended notice the subpart of the future dangerousness factor pertaining to Defendant's low potential for rehabilitation.  (Doc. No. 702 at 5.)  According to Defendant, the subpart must be stricken because the minimum sentence he faces is life imprisonment without the possibility of release and, as a result, the jury's consideration of his rehabilitative potential is not relevant to the sentencing determination.  (Id.)

In support of his argument, Defendant relies on Jacques, in which the United States District Court for the District of Vermont granted the defendant's motion to strike the non-statutory aggravating factor of low potential for rehabilitation on the basis that the defendant's rehabilitative potential was not relevant to the jury's sentencing decision.  2011 WL 1675417, at *26.  The defendant in Jacques was indicted on one count of kidnapping resulting in death and on several counts of producing and possessing child pornography.  Id. at *1.  The kidnapping charge arose out of the abduction and killing of a twelve-year-old girl.  Id.  In support of the rehabilitative potential factor, the Government sought to demonstrate that the defendant had continued to engage in manipulative, deceitful, and violent behavior after having been afforded several opportunities to rehabilitate himself, such as serving a prison sentence and probationary term and participating in a treatment program for sex offenders.  Id. at *27.  Despite recognizing that other courts had allowed juries to consider rehabilitative potential as a non-statutory aggravating factor in capital cases, the court found that "given the particular facts of this case, Jacques's rehabilitative potential is not particularly relevant to the choice between death or life

66

imprisonment without the possibility of parole." Id.  The court reasoned that neither the Government's allegations nor the defendant's past criminal conduct, which exclusively involved female victims who were under the age of eighteen, indicated that he was likely to victimize fellow prisoners or prison officials.  Id.

Jacques is distinguishable from this case.  First, unlike in Jacques, Defendant's allegedly low rehabilitative potential is relevant not as an independent non-statutory aggravating factor but, rather, as it bears on Defendant's future dangerousness in prison.  Second, in Jacques, all of the defendant's past violent crimes involved female victims who were minors.  Conversely, here, Defendant is charged with murdering a fellow prisoner while incarcerated in a federal prison.  As the Government emphasizes in its brief, if Defendant is sentenced to life imprisonment without the possibility of release, "he will likely be in a similar setting during his incarceration."  (Doc. No. 754 at 16.)  Therefore, if the Government is able to demonstrate that Defendant has a low potential for rehabilitation, "the risk that he would remain a danger to other prisoners and prison officials would be increased."  Gooch, 2006 WL 3780781, at *29; see also Allen, 247 F.3d at 788 ("A defendant in prison for life is still a risk to prison officials and to other inmates, and . . . there is still a chance that the defendant might escape from prison or receive a pardon or commutation of sentence.").  In this case, incarceration alone may not wholly prevent Defendant from engaging in future acts of criminal behavior.  See Umana, 707 F. Supp. 2d at 636.  Therefore, the Court will not strike this subpart from the future dangerousness factor.

## 9.  Duplicative of Other Factors

Finally, Defendant contends that the Court should strike references to Defendant having killed Alvin Allery and the Government having proved beyond a reasonable doubt the statutory

and non-statutory aggravating factors contained in the amended notice.  (Doc. No. 702 at 5.)

The future dangerousness factor, as alleged in the amended notice, provides in pertinent part:

"The Defendant represents a continuing danger to the lives and safety of other persons.  The

Defendant has committed the acts alleged in the capital offense charged in the Indictment and in

the statutory . . . factors contained in this Notice . . . ."  (Doc. No. 506-2 at 3.)  Defendant

contends that the future dangerousness factor must be stricken because its reference to the acts

alleged in the statutory aggravating factors has the effect of impermissibly "double counting" the

statutory aggravating factors.  (Doc. No. 700 ¶¶ 15-16.)  In the alternative, Defendant requests

that the Court: (1) strike the language from the future dangerousness factor stating that

Defendant "has committed the acts alleged in the capital offense charged in the Indictment and in

the statutory and non-statutory aggravating factors contained in this Notice;" or (2) preclude the

Government from asserting that any statutory aggravating factor be weighed twice.  (Id. ¶¶ 17,

19.)

        As discussed with respect to Defendant's motion to strike one of the two statutory

aggravating factors regarding previous convictions, the Supreme Court has not held that

duplicative aggravating factors are necessarily unconstitutional, and the circuit courts are split on

the issue.  Duplication occurs only where one aggravating factor "necessarily subsumes" another

factor – that is, where the jury must find one factor in order to find another.  Fell, 531 F.3d at

235-36.  Here, the future dangerousness factor does not necessarily subsume any of the four

statutory aggravating factors alleged in the amended notice.  Although the future dangerousness

factor references the acts alleged in the statutory factors, "it is not sufficient that two aggravating

factors utilize the same evidence . . .; [instead,] one factor must actually subsume the other."

Casey, 2012 WL 6645702, at *3 (citing Fields, 277 F.3d at 1219).  The first two statutory

factors, concerning Defendant's previous convictions, will be supported only by evidence of

Defendant's past criminal conduct.  And the third and fourth statutory factors will be supported

only by evidence indicating that Defendant committed the offense of first-degree murder in an

especially heinous, cruel, or depraved manner and after substantial planning and premeditation,

respectively.  Conversely, the future dangerousness factor will be supported by evidence of

Defendant's "potential for future bad acts, which, in turn, [will be] based upon inferences drawn

from the same conviction[s]" and evidence used in support of the statutory factors.  Id.; see also

Fields, 277 F.3d at 1219 (holding that the "prior violent felony" aggravating factor and a

"continuing threat to society factor" were not impermissibly duplicative).

     The jury will perform different tasks when assessing the statutory aggravating factors and

the non-statutory aggravating factor of future dangerousness.  When assessing the statutory

factors, they will review the evidence in order to determine Defendant's criminal history,

whether he committed the charged offense in a heinous, cruel, or depraved manner, and whether

he committed the offense after substantial planning.  When assessing the future dangerousness

factor, they will consider this – and other – evidence for a different purpose: to determine

Defendant's likelihood of future dangerousness.  See Casey, 2012 WL 6645702, at *3

(discussing the jury's task in assessing statutory and non-statutory aggravating factors); Umana,

707 F. Supp. 2d at 638 (finding that factors that necessitate the consideration of past involvement

in a criminal enterprise and future dangerousness based in part on that involvement were not

impermissible); Mayhew, 380 F. Supp. 2d at 954 (finding that the statutory aggravating factor of

previous conviction of a violent felony involving a firearm was not duplicative of the future

dangerousness factor because "the fact of the conviction, in and of itself, does not prove future dangerousness"). Accordingly, the Court finds that the future dangerousness factor does not necessarily subsume any of the four statutory aggravating factors alleged in the amended notice and will not strike the factor on this basis.

Finally, to the extent that Defendant argues that the future dangerousness factor should be stricken because it duplicates elements of the offense of first-degree murder charged in the superseding indictment, the Court rejects the argument. As discussed, impermissible duplication occurs when, during the sentencing phase of a capital trial, the jury is presented with two interchangeable aggravating factors – that is, they must find one factor in order to find the other factor. Fell, 531 F.3d at 236. Here, the jury will consider the offense of first-degree murder once during the guilt phase of the trial and once during the sentencing phase; they will not consider the offense twice during the latter phase. Thus, the future dangerousness factor is not duplicative of the charge contained in Count One of the superseding indictment. See Mayhew, 380 F. Supp. 2d at 947 (finding that Count One of the indictment was not duplicative of a statutory aggravating factor because "the sentencing jury will only consider the underlying crime one time during the trial phase and one time during [the] sentencing phase"); Frank, 8 F. Supp. 2d at 276-77 ("Once the penalty phase has begun, the jury is asked to consider only once the fact that the murder occurred in the course of the commission of another crime. That the jury may find it relatively easy, based on its guilty verdict, to find the existence of this factor does not unfairly tip the scales toward death.") (emphasis in original).

### D. Non-Statutory Aggravating Factor of Victim Impact

Next, Defendant argues that the Court should strike the non-statutory aggravating factor

of victim impact because: (1) it fails to genuinely narrow the universe of capital defendants for whom the death penalty is available; and (2) the factor is vague and overbroad in violation of the Fifth, Sixth, and Eighth Amendments. (Doc. No. 696 ¶ 12; Doc. No. 697 at 1-5.) Defendant's first contention "runs counter to the existing authorities which have rejected similar challenges" to the use of the victim impact factor. Lecco, 2007 WL 1074775, at *5 (citing Higgs, 353 F.3d at 320-21). Non-statutory aggravating factors, such as victim impact, need only be considered after a defendant has become death-eligible by the jury's finding of at least one statutory aggravating factor and serve only to individualize the jury's sentencing determination, not to narrow the class of death-eligible defendants. See, e.g., Higgs, 353 F.3d at 320.

The Court also rejects Defendant's second contention. As Defendant himself recognizes, the Supreme Court has held that there is no per se constitutional bar to the introduction of victim impact evidence in a capital proceeding. Payne, 501 U.S. at 827. In Jones, the Supreme Court rejected the argument that a victim impact factor is impermissibly overbroad, opining:

> Of course, every murder will have an impact on the victim's family and friends and victims are often chosen because of their vulnerability. It might seem then that [victim impact and victim vulnerability factors] apply to every eligible defendant and thus fall within the Eighth Amendment's proscription against overbroad factors. But that cannot be correct; if it were, we would not have decided Payne as we did. Even though the concepts of victim impact and victim vulnerability may well be relevant in every case, evidence of victim vulnerability and victim impact in a particular case is inherently individualized. And such evidence is surely relevant to the selection phase decision, given that the sentencer should consider all of the circumstances of the crime in deciding whether to impose the death penalty.

527 U.S. at 401-02. At the eligibility stage, where the jury must determine if at least one statutory factor has been proven, and the selection stage, where the jury must consider the

statutory factors along with non-statutory and mitigating factors, "'the process [must be] neutral and principled so as to guard against bias or caprice in the sentencing decision.'" Id. at 402 (quoting Tuilaepa, 512 U.S. at 973). The Supreme Court concluded that "[s]o long as victim vulnerability and victim impact factors are used to direct the jury to the individual circumstances [and evidence] of the case," the factors are not impermissibly overbroad. Id. Following Jones, the Court rejects the contention that the victim impact factor must be stricken as overbroad.

Defendant, nevertheless, contends that the victim impact factor is impermissibly vague because it does not specify Allery's personal characteristics, generally references "loss to the victim and the victim's family," and includes "friends" as potential witnesses. Although evidence supporting a victim impact factor is generally admissible, the Court is obligated to exclude such evidence if its probative value is outweighed by the danger of unfair prejudice to the defendant, confusion of the issues, or the likelihood that the jury will be misled. 18 U.S.C. § 3593(c); Payne, 501 U.S. at 825; United States v. Rivera, 405 F. Supp. 2d 662, 668-69 (E.D. Va. 2005). In addition, the Court must "control the nature and scope of this information so that the jury is not influenced by passion or prejudice." Hammer, 2011 WL 6020581, at *3 (citing United States v. O'Driscoll, 203 F. Supp. 2d 334, 340 (M.D. Pa. 2002)).

The Government argues that the victim impact factor is not impermissibly vague because it gave notice of its intent to present victim impact evidence and has provided Defendant with copies of interviews with the potential witnesses as well as with copies of letters written by the victim. At the May 7, 2012 hearing, counsel for the Government, however, was not able to articulate the nature and scope of the victim impact evidence that would be presented during the penalty phase of the trial. (See Doc. No. 588 at 6.) During the hearing, counsel for Defendant

also stated that some of Allery's family members misunderstood the circumstances of Allery's death and raised concerns that the testimony of these individuals may contain factual inaccuracies and be overly emotional.  (Id.)  In the Court's order granting the Government's motion to amend its notice of intent to seek the death penalty to include the victim impact factor, the Court recognized that the parties disputed the nature and scope of the victim impact evidence and granted Defendant leave to file a subsequent motion to exclude victim impact evidence "once the Government specifically identifie[d] the nature of such evidence."  (Id. at 8.)  To date, the Government has not provided Defendant with more specific information.  Accordingly, the Court will order the Government to provide an informational outline to Defendant, containing: the personal characteristics of Allery that it intends to prove; whether the Government intends to present the testimony of any individuals who are not identified by name in the amended notice; the particularized categories of injury, harm, and loss that it intends to present during the penalty phase; whether the Government has informed the individuals identified by name in the amended notice of the accurate circumstances of Allery's death and corrected any of their misunderstandings; and any other pertinent information Defendant would need to adequately prepare responses during the penalty phase.  This approach is consistent with those taken by several other courts.  See, e.g., Hammer, 2011 WL 6020581, at *3-*4; Bin Laden, 126 F. Supp. 2d at 304; Llera Plaza, 179 F. Supp. 2d at 474-75; United States v. Cooper, 91 F. Supp. 2d 90, 111 (D.D.C. 2000).

### E.     Motion for **Brady/Giglio** Discovery

In his motion to strike the victim impact factor (Doc. No. 696), and by separate motion (Doc. No. 692), Defendant requests the Court to enter an order directing the Government to

disclose all evidence favorable to Defendant pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  Defendant seeks all favorable evidence with respect to all of the statutory and non-statutory aggravating factors.  In his brief in support of the latter motion, Defendant recognizes that "the office of the United States Attorney is aware of its <u>Brady</u>/<u>Giglio</u> obligations with respect to the penalty phase of a capital prosecution" but moves the Court for an order "out of an abundance of caution."  (Doc. No. 693 at 2.)

Defendant also filed a specific discovery request for impeachment evidence pursuant to <u>Giglio</u> on January 14, 2013.  (Doc. No. 718.)  In that filing, Defendant requested that the Government provide specific information relating to all potential trial witnesses.  (<u>Id.</u>)  On February 1, 2013, the Government filed a response, indicating that specific items of discovery would be provided to Defendant.  (Doc. No. 744.)  Further, in response to Defendant's motion for disclosure of all <u>Brady</u>/<u>Giglio</u> discovery, the Government makes clear that it "will provide <u>Brady/Giglio</u> discoverable information whether it relates to witnesses during the guilt portion of the trial, or should it be necessary, the penalty phase of the trial."  (Doc. No. 745 at 2.)  The Government also points out that Defendant cites no legal authority indicating that his requested order is necessary or proper.  (<u>Id.</u> at 4.)  Defendant did not file a reply to the Government's brief.

Based on the Government's assertions, the Court is satisfied that counsel for the Government are aware of their obligations under <u>Brady</u> and <u>Giglio</u>.  Thus, the Court will deny Defendant's motion (Doc. No. 692) but, in doing so, does not relieve the Government of any of its obligations.

IV.    **CONCLUSION**

For the foregoing reasons, the Court declines to declare the FDPA or the federal death

penalty itself unconstitutional and, therefore, rejects the claims set forth in Defendant's motion to strike the Government's amended notice of intent to seek the death penalty and all non-statutory aggravating factors (Doc. No. 705). The Court further finds that an evidentiary hearing is not necessary to resolve them. Accordingly, the Court denies that motion in its entirety.

Furthermore, the Court finds that the two statutory aggravating factors relating to Defendant's previous convictions are not unconstitutionally duplicative of one another and that neither the "substantial planning" statutory aggravating factor not the "heinous" statutory aggravating factor are void for vagueness or for failing to narrow the class of death-eligible defendants. Moreover, with respect to the substantial planning and heinous factors, the Court need not determine at this juncture whether the factors are supported by sufficient factual bases. Accordingly, the Court will deny Defendant's three motions challenging the statutory aggravating factors. (Doc. Nos. 690, 698, 703.)

With respect to Defendant's motion challenging the use of evidence of Defendant's disciplinary infractions in support of the non-statutory aggravating factor of future dangerousness, the Court will prohibit the Government from introducing evidence of Defendant's alleged attempted escapes from prison to support the factor and will order the Government to submit a more detailed proffer of evidence that it intends to present during the penalty phase. Upon review of the proffer, the Court will enter a ruling on the motion. (Doc. No. 694.) With respect to the other two motions challenging the future dangerousness factor, the Court – finding that the factor does not conflict with congressional intent, will not lessen the Government's burden of proof, is not impermissibly misleading or unreliable, need not narrow the class of death-eligible factor, is not duplicative of the statutory aggravating factors, and

inclusion of the low rehabilitative potential subpart is relevant – will deny them both. (Doc. Nos. 688, 700.)

Regarding Defendant's motion challenging the non-statutory aggravating factor of victim impact (Doc. No. 696), the Court will not strike the factor as impermissibly vague but, in accordance with this memorandum, will direct the Government to provide Defendant with an informational outline of the evidence it intends to use in support of the factor. Finally, with respect to Defendant's motion requesting an order directing the Government to comply with <u>Brady</u> and <u>Giglio</u> (Doc. No. 692), the Court finds that such an order is not necessary and, thus, will deny the motion.

An order consistent with this memorandum follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **No. 4:08-cr-00070** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **RITZ WILLIAMS,** | : | |
| **Defendant** | : | |

## ORDER

**AND NOW**, on this 29th day of March 2013, in accordance with the foregoing

memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendant Williams's motion to strike the notice of intent to seek the death penalty and all non-statutory aggravating factors (Doc. No. 705), Defendant's motions challenging the statutory aggravating factors (Doc. Nos. 690, 698, 703), Defendant's motion to strike the non-statutory aggravating factor of future dangerousness on the basis that as asserted the reasonable doubt proof standard would be subverted (Doc. No. 688), and Defendant's motion to strike the non-statutory aggravating factor of future dangerousness or alternatively to amend the future dangerousness aggravating factor (Doc. No. 700) are **DENIED**;

2. Defendant's motion to strike the disciplinary infractions from the non-statutory aggravating factor of future dangerousness (Doc. No. 694) is **GRANTED** to the extent that it seeks to strike the thirteenth infraction, and the Court will defer entering a ruling on the admissibility of the other fifteen disciplinary infractions pending review of the Government's proffer of evidence;

3. The Government is directed to provide Defendant and the Court with a more detailed proffer of evidence regarding the specific disciplinary infractions it intends to present during the penalty phase of this action, should one be reached, within fourteen (14) days of the date of this order;

4. Defendant's motion to strike the non-statutory aggravating factor of victim impact (Doc. No. 696) is **DENIED** to the extent it seeks to strike the factor and is **GRANTED** to the extent that it requests an order directing the Government to file an informational outline. The Government is directed to provide Defendant and the Court with an outline of evidence in accordance with the foregoing memorandum within fourteen (14) days of the date of this order; and

5.     Defendant's <u>Brady</u>/<u>Giglio</u> motion (Doc. No. 692) is **DENIED**.

s/ Yvette Kane
Yvette Kane, Chief Judge
U.S. District Court
Middle District of Pennsylvania
